WILLIAM G. WILSON

*v.*

LOGAN H. ROOTS.

*Filed at Ottawa January 25, 1887.*

1. CONTRACTS—*construction of contracts—separate writings construed together as one.* Where different instruments are executed as the evidence of one transaction or agreement, they are to be read and construed as constituting but a single instrument.

2. SAME—*parol evidence, in aid of construction of written contract.* Although it is not competent to contradict or enlarge the terms of a written agreement by parol evidence, it is competent to resort to such evidence to ascertain the nature and qualities of the subject to which the instrument refers.

3. SAME—*attendant circumstances, as manifesting intention of parties.* Courts, in construing written contracts, endeavor in all cases to place themselves in the position of the contracting parties, so that they may understand the language, and in the sense intended by the persons using it.

| | |
|---|---|
| 119 | 379 |
| 121 | 365 |
| 119 | 379 |
| 124 | 296 |
| 119 | 379 |
| 34a | 198 |
| 119 | 379 |
| 149 | 414 |
| 153 | 317 |
| 119 | 379 |
| 54a | 26 |
| 119 | 379 |
| 170 | 577 |
| 172 | 622 |
| 71a | 127 |
| 119 | 379 |
| 174 | 73 |
| 74a | 464 |
| 119 | 379 |
| 84a | 627 |
| 119 | 379 |
| 183 | 501 |
| 119 | 379 |
| 86a | 659 |
| 119 | 379 |
| f92a | 1372 |
| 92a | 1532 |
| 119 | 379 |
| 190 | 1411 |
| 119 | 379 |
| 202 | 1119 |
| 119 | 379 |
| 213 | 1588 |
| e114a | 1210 |
| 114a | 442 |
| 114a | 1560 |

4. SAME—*contract for exchange of stock in an incorporated company for bonds of the same company—construed, in respect to the purpose of the exchange, etc.* A contract for the exchange of stock in an incorporated company, organized for the manufacture of sewing machines, for bonds of the same company, provided that the first party should place in the hands of a custodian or depositary, properly transferred, $29.500 of the stock, and receipts of a third person, with proper assignments, of $15,000 more stock then loaned to such third person, making $44,500 of the stock, and that the second party should deposit $40,000 of the bonds of the same company, to be delivered to the first party by the custodian, upon satisfactory evidence that the company was producing three hundred sewing machines per week, the bonds to be delivered to the assignor of the stock, and the stock to the other party, and the contract further provided that each party should make his delivery within twenty days: *Held,* that it was the duty of the first party, within twenty days, to deposit with the custodian, evidences of unincumbered, properly transferred stock, to the amount of $44,500, and that the obligation to transfer the receipt for $15,000 of bonds which had been loaned, did not imply a sale of a claim on the maker of such receipt for so much stock, but that such person then held the bonds in such condition that he could return the same, and a reasonable time, only, was allowed in which the company should produce three hundred sewing machines per week.

5. SAME—*condition construed—as to the producing capacity of a manufacturing company.* Where a contract for the exchange of the bonds of a manufacturing corporation for stock in the corporation, is dependent upon its producing three hundred sewing machines per week, that number of complete machines must be the fair average product of the week, evincing a continuous average capacity of that amount per week, to make the contract complete.

6. SAME—*with whom a contract is considered as having been made, as giving the right to avail of its provisions.* The owner of stock in a private corporation made a contract with another for its exchange for bonds of the same corporation, in which it was recited, that "for and in consideration of payments" made by the latter in purchasing the stock, the former had covenanted and agreed with the latter to give to such corporation his unstinted, unreserved, hearty good will, active assistance, counsel, aid and advice, for the next three years, and to do all he could to make such corporation a complete success, and to assign to it certain other stock, and agreed to forfeit certain royalties to the corporation in case of his failure to perform his said covenants: *Held,* that the covenant was with the purchaser of the stock, and for his benefit as a stockholder, notwithstanding the corporation might also derive a benefit from the performance of the same, and that without performance by the covenantor he could not enforce the agreement as against the covenantee.

.7. SAME—*contract for services, construed—as to the character of service to be rendered.* Where a party contracted to give "his unstinted, unreserved,

hearty good will, active assistance, counsel, aid and advice, for the next three years, through good and ill, and to do all, except financial management, that he" could "in any way do * * * to make the most complete possible success" of a sewing machine company, "without further request," etc., it was *held*, that his duty was not negative or passive, but affirmative and active, and no request was necessary in order to fix his obligation in that regard.

8. SAME—*rescission of contract—effect of providing a penalty for non-performance.* A party to an executory contract will not be denied the right to rescind the same for a breach thereof by the other party, on the ground that he might perform his part and then recover a penalty provided in the contract, in an action at law, for such non-performance.

9. SAME—*the particular case, showing right to rescind.* The holder of stock in a private corporation for the manufacture of sewing machines, by misrepresentation as to the value of the property of the corporation, and its capacity to make a large number of machines a week, and by his agreement and covenants to give his active aid and assistance in making the business of the corporation a success, and to transfer to it certain stock in a prior company which it had succeeded, induced another to enter into a contract, whereby he was to purchase of the former $44,500 of the stock of the new corporation for $40,000 of its bonds, the stock and bonds to be placed in the hands of a third person within twenty days, to be delivered upon a certain condition. The first named party failed to procure and deliver the stock, unincumbered, within the time prescribed, and could not, up to the time of the filing of the bill to rescind, make a clear title to the bonds, and generally had failed to perform his part of the contract: *Held*, on such bill filed, that the purchaser of the stock had the right to have a rescission of the contract.

10. SAME—*whether time is of the essence of the contract.* In general, time is not of the essence of a contract, unless so declared by the parties; but the rule has its exceptions, as, if the thing sold be of greater or less value, according to the effluxion of time, it is manifest that time is of the essence of the contract.

11. So where a party had agreed to prepare a model for the manufacture of sewing machines by a corporation, the expense of which was $8000 or $10,000 a month, and a delay in bringing its factory to a profitable productive capacity, would necessarily depreciate the stock of the corporation in value, the time for the performance of the undertaking is necessarily of the essence of the contract.

12. APPEARANCE—*as a waiver of defect in service.* A defendant in an attachment suit, by the entry of his appearance and going to trial on the merits, waives any objection he may have as to the service of process on him.

13. ESTOPPEL—*of the elements essential to an estoppel.* One entitled to the assignment of stock in a private corporation, free of incumbrance, will not be estopped from urging an attachment of the same in a suit against his vendor, as affecting his ability to make a valid assignment, merely from the

fact he may have known of the attachment and proposed ways for obviating the same, none of which were accepted, and when he has done no act to cause his vendor to change his course of conduct. In such case, the indispensable elements of an estoppel, fraud and injury, are wanting.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS A. MORAN, Judge, presiding.

Messrs. LEAMING & THOMPSON, for the appellant:

The stock deposited by appellant, Wilson, with Gage, was properly transferred, as between Wilson and Roots, by Wilson's indorsement of assignment and authority to Roots to make the transfer on the books of the corporation, on the certificates of stock. *Railroad Co.* v. *Schuyler*, 34 N.Y. 30; *Leitch* v. *Wells*, 48 id. 585; *McNeil* v. *National Bank*, 46 id. 325; *Johnson* v. *Laflin*, 103 U. S. 532; *National Bank* v. *Watsontown Bank*, 105 id. 217; *Stone* v. *Hackett*, 12 Gray, 227; *Otis* v. *Gardner*, 105 Ill. 436; *Colt* v. *Ives*, 31 Conn. 25; *Kellogg* v. *Stockwell*, 75 Ill. 68; *Laing* v. *Burley*, 101 id. 591; Lowell on Transfer of Stock, secs. 91, 96, 98, 99.

Appellee, Roots, is estopped from claiming a forfeiture or annulment of the contract on the grounds of appellant not having properly transferred the capital stock in compliance with said agreement, by reason of subsequent acquiescence, shown by his conduct and correspondence with appellant, even if he had been entitled to so avoid it when the knowledge of the failure first came to him. *Boutwell* v. *O'Keefe*, 32 Barb. 434; *Noble* v. *Chrisman*, 88 Ill. 199; *Hanna* v. *Ratekin*, 43 id. 462; Herman on Estoppel, pp. 335, 337, 340, 343, 457; also, secs. 331, 336, 463, p. 463, and sec. 469, and p. 464, and note.

The agreement and conversations respecting the sale of the stock by Wilson, to Roots, of November 13, 1883, were all merged in the contracts in writing made on November 13, 1883, and no verbal agreement respecting the same matter

prior to that time can be shown to contradict or vary the written agreements. *Wadhams* v. *Swan*, 109 Ill. 46; *Manufacturing Co.* v. *Wire Fence Co.* id. 71.

Messrs. PECKHAM & BROWN, and Mr. THOMAS H. PEASE, for the appellee:

The agreement between Wilson and Roots, under which the deposits were made, was one and entire. *Chestnut* v. *Chestnut*, 15 Bradw. 442; *Gardt* v. *Brown*, 113 Ill. 475.

Wilson prevailed upon Roots to make the agreement by fraudulent threats, and hence he can not have it enforced, and Roots may have it cancelled. *Bowes* v. *Heaps*, 3 Ves. & Beames, 117; *Darley* v. *Singleton*, 1 Wightw. 25; *Roche* v. *O'Brien*, 1 Ball & Beat. 330; *Dunbar* v. *Tredennick*, 2 id. 304; *Gowland* v. *De Faria*, 17 Ves. 20; *Willan* v. *Willan*, 16 id. 72.

Roots was induced to enter into the agreement by false and fraudulent representations made by Wilson. This will prevent a decree for its specific performance, and authorize Roots to rescind. Pomeroy on Sp. Per. sec. 224, pp. 306-8; Kerr on Fraud and Mistake, sec. 2, p. 53; *Falcke* v. *Gray*, 4 Drewry, 651; *Warner* v. *Daniels*, 1 Woodbury & Minot, 90; *Conybeare* v. *Land Co.* 1 DeG., F. & J. 578; *Allen* v. *Hart*, 72 Ill. 104; *Bradley* v. *Luce*, 99 id. 234; *Blake* v. *Mowatt*, 21 Beav. 603; *Coffee* v. *Ruffin*, 4 Coldw. 487.

Wilson has neglected and refused to perform on his part, hence the agreement confers no rights on him. 2 Parsons on Contracts, *675; 3 id. *407.

There has been a failure of consideration, moving to Roots, for the agreement, and while the agreement was still executory,—hence the agreement was not binding on him. *Roget* v. *Merritt*, 2 Caine, 117; *Benedict* v. *Field*, 4 Duer, 154; 16 N. Y. 595; *Christin* v. *Cabell*, 22 Gratt. 82.

Time was necessarily of the essence of the contract. *Hipwell* v. *Knight*, 1 Y. & C. 401; *Coslake* v. *Till*, 1 Russ. 376; *Barker* v. *Prentiss*, 6 Mass. 430.

Mr. Justice Scholfield delivered the opinion of the Court:

This was a bill in equity, by Logan H. Roots, against William G. Wilson, filed in the circuit court of Cook county on the 9th day of May, A. D. 1884, for the rescission of a certain contract for the assignment and transfer by Wilson, to Roots, upon certain conditions, of $44,500 of the capital stock of the Wilson Sewing Machine Company of Wallingford, Connecticut, in exchange for $40,000 of the bonds of that company. Wilson answered the bill, putting in issue its material allegations, and then filed a cross-bill for the specific performance of the contract of which rescission is sought by the bill. The circuit court, on hearing, decreed that the cross-bill be dismissed, and that the prayer of the original bill be granted. On appeal to the Appellate Court for the First District, that decree was affirmed, and Wilson has appealed from that judgment of the Appellate Court to this court.

The contract in controversy is evidenced by two instruments in writing, executed at the same time and as a part of the same transaction, (as is abundantly proved by the evidence in the record,) which read as follows:

"Chicago, *November 13, 1883.*
"*L. J. Gage, Esq., Chicago, Ill.:*

"Dear Sir:—It is understood between W. G. Wilson and Logan H. Roots, that W. G. Wilson is to furnish, properly transferred, $29,500 stock in the Wilson Sewing Machine Company of Wallingford, Conn., and receipts of S. Kirby, with proper transfer or assignments of $15,000 more stock now loaned to said Kirby by him, making a total of $44,500 (forty-four thousand five hundred dollars,) capital stock of said company, and Logan H. Roots is to deposit $40,000 (forty thousand dollars) of the bonds of the said company, bearing six per cent interest, with coupons No. 1 detached; and whensoever you receive notice from the general manager of said company, or other satisfactory evidence, that the com-

pany at Wallingford is producing three hundred complete sewing machines per week, you are to deliver the bonds to W. G. Wilson, and the stock to Logan H. Roots.

"In testimony of which request, we hereby append our signatures, it being understood that each party hereto is to make his respective delivery within twenty days from the date hereof.   Signed in triplicate.

Respect.                          LOGAN H. ROOTS,
                                        W. G. WILSON."

"For and in consideration of payments made by Logan H. Roots, in purchasing stock from W. G. Wilson, it has been covenanted and agreed between Logan H. Roots, of Little Rock, Arkansas, and W. G. Wilson, of Chicago, Illinois, that W. G. Wilson agrees, without further direct consideration than the reimbursement of his expenses, to give to the Wilson Sewing Machine Company of Wallingford, Conn., his unstinted, unreserved, hearty good will, active assistance, counsel, aid and advice, for the next three years, through good and ill, and to do all, except financial management, that he can in anywise do, while others are in actual management, to make the most complete possible success of the Wilson Sewing Machine Company. Wilson also agrees to at once,—after first assigning to himself its present assets,—transfer and properly assign all of the stock of the Wilson Sewing Machine Company of Chicago, to the Wilson Sewing Machine Company of Wallingford, Conn., free of all debts; and as a guaranty of good faith, he pledges and hereby forfeits to the Wilson Sewing Machine Company of Wallingford, Conn., on failure to continue in the execution of the foregoing agreements, the extent of $25,000 in amount of the royalty of twenty-five cents on each machine, agreed to be paid him by the company for the use of his patents.

"Witness our hands this 13th day of November, 1883.

"Witness:                           W. G. WILSON,
     J. N. KELLER,                  LOGAN H. ROOTS."
     S. B. KIRBY.
     25—119 ILL.

The first of these instruments was executed in triplicate, and one copy was delivered to L. J. Gage, and one was retained by Roots and one by Wilson. The second was executed in duplicate, and one copy, each, was retained by Roots and Wilson.

The rule is familiar, and of frequent application in cases before this court, that where different instruments are executed as the evidence of one transaction or agreement, they are to be read and construed as constituting but a single instrument. *Gardt* v. *Brown et al.* 113 Ill. 475; *Freer* v. *Lake*, 115 id. 662; *Canterberry* v. *Miller*, 76 id. 355; *Stacey* v. *Randall*, 17 id. 467; *Duncan* v. *Charles*, 4 Scam. 561; *Bailey* v. *Cromwell*, 3 id. 71. And, furthermore, although it is not competent to contradict or enlarge the terms of a written agreement by parol evidence, it is competent to resort to parol evidence to ascertain the nature and qualities of the subject to which the instrument refers. (1 Greenleaf on Evidence, sec. 286.) And so we have said, that courts, in construing written contracts, endeavor, in all cases, to place themselves in the position of the contracting parties, so that they may understand the language used, in the sense intended by the persons using it. *Doyle et al.* v. *Teas et al.* 4 Scam. 202; *Turpin, Receiver*, v. *Baltimore, Ohio and Chicago Railroad Co.* 105 id. 11; *Brand et al.* v. *Henderson et al.* 107 id. 141.

The facts, in the light of which these instruments are therefore to be read, are briefly these: A corporation, spoken of by the witnesses as the Wilson Sewing Machine Company of Chicago, had been in existence and doing business for several years prior to the year A. D. 1882. It occupied certain buildings in the city of Chicago for sales-rooms, store-rooms, workshops and offices, and it had a factory for the manufacture of sewing machines at Grand Crossing, in Cook county. William G. Wilson was the owner of most, if not all, of the stock of the company. He was its president and manager, and controlled it entirely. In July or August, A. D. 1882, it ceased

to manufacture, and about that time,.through the efforts of Wilson, and his. manager, Sheldon, acting under his direction, a corporation was organized at Wallingford, Connecticut, under the name of the "Wilson Sewing Machine Company of Wallingford, Connecticut." Its capital stock was fixed at $300,000, of which Wilson agreed to take $100,000, the Wallingford company agreeing to take from him the movable plant at Grand Crossing for that sum. Parties at Wallingford took $106,000 of the stock, thus leaving $94,000 untaken, but it was agreed by the promoters of the company that this should be subscribed by Sheldon, with the understanding that he was to pay nothing for it, and that the company should sell it to other parties. Wilson was elected president of the new company, and his salary was fixed at $5000 per annum; and he was also made the general manager of the company. The erection of buildings at Wallingford was begun, and prosecuted with reasonable dispatch, and that company, while the buildings, etc., were being erected, also manufactured sewing machines at Grand Crossing. The evidence shows that this was attended with loss, and in February, A. D. 1883, after the buildings at Wallingford had been erected at a cost of some $75,000, there was, substantially, no money in the treasury. Wilson had also, meanwhile, contracted to sell to the company the furniture, material, etc., of the Chicago company not included in the plant at Grand Crossing, for $75,000.

Samuel B. Kirby was an agent for the sale of sewing machines, having his residence and headquarters at Little Rock, Arkansas. He had dealt in the machines manufactured by Wilson, and had been quite successful in disposing of them. Logan H. Roots likewise resided at Little Rock, and was the president of a bank there, and was also actively engaged, at the same time, in some nineteen other corporations. In January or February, A. D. 1883, Roots and Kirby entered into co-partnership for the purpose of selling sewing machines in the State of Arkansas, Roots furnishing $3000 or $4000 in

money, and Kirby agreeing to exclusively attend to the business. Wilson having communicated with Kirby, through him commenced negotiations with Kirby & Roots, which resulted in a sale, on the 27th day of March, A. D. 1883, to Roots, of $36,850, to Kirby, of $25,000, and to Niemeyer, another citizen of Little Rock, of $10,000, of the Wallingford stock nominally subscribed for by Sheldon; and the balance of the Sheldon stock was taken, as we understand the record, not far from this time, by other parties. There is evidence, that, to induce these sales, Wilson represented that the work at Wallingford was progressing; that the plant would be removed from Grand Crossing to Wallingford in April; that the stock would bear sixty-six and two-thirds per cent; that he himself had paid $100,000 for the stock he held, etc. Although Roots, Kirby and Niemeyer were elected directors in April, Roots seems to have given the business but little personal attention, being occupied, most of the time, with other matters. The machinery was not removed from Grand Crossing at the time first indicated by Wilson. Afterwards, he represented to Roots that it would be removed to Wallingford, and that everything would be in operation there by the 1st of August. But that promise was not fulfilled. At a meeting of the board of directors, in September, A. D. 1883, bonds of the company were issued to the amount of $50,000, secured by a first mortgage on the property at Wallingford, to raise money wherewith to pay expenses.

On the 13th of October, A. D. 1883, on the representation of Wilson that in a few days the factory would be producing a large number of machines, that the machine would be the best looking, the best finished, and the most rapid-working machine in the market, and that it would be made and sold for a large profit, and on the promise that Wilson would, at the meeting of the board of directors in November, resign as president and general manager of the company, and use his influence to have Roots elected president, and that he would

thereafter give his time and attention to the business of the company until the re-organization would be working satisfactorily, Roots bought of Wilson $50,000 of the Wallingford stock held by Wilson. Wilson did not attend the meeting of the board of directors at Wallingford on November 5, but he sent his resignation as president and general manager of the company to the board, at that time, and it was accepted by the board, and Roots was then elected president of the company. Just before this, in the latter part of October, Wilson notified Roots that it would require $8000 to meet the expenses of the company for the month of November, and that it would require $10,000 per month thereafter for that purpose. After being elected president, Roots found, as he thought, things in a very different condition from what they had been represented to him by Wilson, and at a meeting which occurred between him and Wilson, at the Grand Pacific Hotel, in Chicago, on the day that these instruments were signed, but before they were signed, Roots called Wilson's attention to them. Among other things, he had learned at Wallingford that manufacturing was delayed for want of a model machine, and a machine intended to be used for that purpose had just been sent to Wilson, and was then in his possession. Wilson, at that time, informed Roots that the machine was not quite satisfactory, but that he could make it so in a short time, but he added, that unless Roots would buy the remainder of his stock in the company, he would have nothing to do with the machine, and would do nothing in aid of the business of the company. In reply to the suggestion that the machinery at Wallingford was insufficient, Wilson said, "You are all wrong in your conclusions," and "the factory people are muddled," and assured him that the machinery then in place in the factory at Wallingford, would, if he took hold, be, within ten days, turning out satisfactory sewing machines, at the rate of three hundred per week; that he would, if Roots bought his stock, personally go to Wallingford, perfect the model, and

see that the factory was in operation at that rate, and that Root's inference of the impossibility of this, from what he had just seen and heard at Wallingford, arose from his want of familiarity with the conditions and possibilities of mechanical operations. Wilson also then again assured Roots that the profits on the machines would be very large, and he then exhibited to Roots a memorandum which he had made, showing that he had contracted for piece work on terms that would give a large profit on the machines, and so that when the factory got into operation, it would make two thousand machines per month, which could be readily sold at a profit of five dollars per machine. Roots expressed doubts about the real value of the assets of the company, and, in answer to questions in that respect, Wilson assured him that the movable machinery was well worth the $100,000 which had been paid for it; that Root's suspicions of the worthlessness of some of this property were due entirely to his ignorance of the requirements of the sewing machine business. Roots called Wilson's attention to an old understanding, that had not been carried out, that Wilson should cause the stock of the Chicago company to be transferred to the Wallingford company, and Wilson agreed that that should be included in his undertaking. It was agreed that Wilson should enter into bond for his cordial coöperation in promoting the welfare of the company, and further transfer of the stock of the Chicago company, and finally it was further agreed, that, by way of bond, Wilson should pledge, to the extent of $25,000, the royalties which were to come to him from the machines to be manufactured by the company.

The evidence fully shows that Wilson had great mechanical knowledge and capacity, and was thoroughly skilled in all the details of manufacturing sewing machines, and the necessary machinery therefor, and that he had had a number of years of experience in manufacturing and selling sewing machines, and that Roots, although a shrewd and successful business

man, had no knowledge of the manufacture of sewing machines or of the necessary machinery therefor, and had had no practical experience either in manufacturing or selling sewing machines. Evidence also shows that it was agreed that this purchase of Wilson's stock by Roots should not take effect until Wilson should have fulfilled his promise to bring the model machine into such a condition of efficiency as to produce satisfactory machines at the rate of·three hundred per week, and he was to go, himself, to the factory, and remain there until this was accomplished. It is true, there is controversy as to some of the matters we have thus stated, but the fair preponderance of the evidence, in our opinion, is as we have stated.

In the light of these facts, and construing the two instruments as one, we think it is clear—

*First*—That it was the duty of Wilson to deposit with Gage, within the twenty days, evidences of unincumbered, properly transferred stock in the Wilson Sewing Machine Company of Wallingford, Connecticut, to the amount of $44,000. The obligation to transfer the Kirby receipts does not imply that, as to that amount, there was simply a sale of a claim against Kirby for so much stock, but that Kirby then had, in a condition that it could be returned, so much stock, which he could, and which Roots would thereby have a right to demand he should, deliver to him.

*Second*—Although no time is mentioned within which the company should produce three hundred sewing machines per week, it must have been within a reasonable time,—such a time as would have enabled Wilson to perfect a model and get the forces properly re-organized, so far as he could accomplish this while others were in the actual management. (*Niemeyer* v. *Brooks*, 44 Ill. 77; *Smith* v. *Gear*, 59 id. 381.) And without saying that ten days, the time designated by Wilson, would have been such reasonable time, we are clear in the opinion that a reasonable time, for that purpose, had elapsed before the

filing of the bill. It is true that, in general, time is not, unless so declared by the parties, of the essence of the contract; but the rule has exceptions, as, if the thing sold be of greater or less value, according to the effluxion of time, it is manifest that time is of the essence of the contract. (*Hipwell* v. *Knight*, 1 Younge & Coll. 416.) And here, it is evident that the expenses running, during November, at $8000 per month, and afterwards at $10,000 per month, the corporation,—already indebted $50,000,—must soon become bankrupted, and the stock worthless; and in proportion as was the delay in bringing the factory up to a profitable productive capacity, it is further evident there must have been a depreciation in the value of the stock. It could not concern Roots that the factory had produced three hundred complete sewing machines per week after delays and consequent expenses destroying the value of the stock. See *Garretson* v. *Vanloon*, 3 Greene, (Iowa,) 128; *Coslake* v. *Till*, 1 Russ. 376; *Dalovet* v. *Rothschild*, 1 Sim. & Stuart, 590.

*Third*—The three hundred complete sewing machines per week must be the fair average product of the week, evincing a continuous average capacity of that amount per week.

*Fourth*—It was the duty of Wilson to give "his unstinted, unreserved, hearty good will, active assistance, counsel, aid and advice, for the next three years, through good and ill, and to do all, except financial management, that he can in any way do, while others are in the actual management, to make the most complete possible success of the Wilson Sewing Machine Company," without further request or solicitation from Roots or any one else. His duty was not negative or passive, but affirmative and active.

It is objected on behalf of Wilson, that the writing last recited was for the benefit of the Wilson Sewing Machine Company as a corporation, and the penalty therein provided, in case of breach on the part of Wilson, accrues to said corporation, and the right of action, in the event of such breach,

is in the corporation, and not in Roots. But the instrument recites, that "for and in consideration of payments made by Logan H. Roots, in purchasing stock from W. G. Wilson, it has been covenanted and agreed between Logan H. Roots, of Little Rock, Arkansas, and William G. Wilson, of Chicago, Illinois." Thus the consideration moved from Roots, and Wilson's covenants are directly with him. Undoubtedly, the covenants affect the corporation, but Roots, as a large stockholder, would presumably be benefited by the performance of the covenants, in the enhancement of the value of the stock, and these covenants enter into the consideration for the execution of the instrument first recited, the whole forming, in our opinion, as has been seen, but one single undertaking or agreement. Unless Wilson performed these covenants, the undertaking in the instrument first recited could not be enforced.

Nor do we regard the fixing of a penalty in the instrument as controlling the question of rescission or specific performance. Where the penalty affords an adequate remedy at law, it may afford a reason why a court of equity will not interfere. Fry on Specific Performance, (2d Am. ed.) 72, *26, and 73, *27, secs. 66, 67, 68, 69. But the failure of Wilson to keep these covenants, would tend to render the penalty of no value to Roots or to the corporation, and the remedy at law, in the present case at least, would be inadequate. But apart from this, the effect of a penalty in such agreements can only be important on the question of specific performance or the question of the rescission of an executed contract. This contract is only executory, as yet; and we have knowledge of no case where a party has been denied rescission of an executory contract, on the ground that he might go on and perform his part, and then recover a penalty, in an action at law, of the other party, for his non-performance.

Without entering into an elaborate recitation and discussion of the immense volume of evidence before us, we state,

as the result of a patient and careful examination of it, that, in our opinion, it warrants the conclusion that Wilson has not complied with his undertakings under these instruments. He has not given his "unstinted, unreserved, hearty good will, active assistance, counsel, aid and advice, * * * through good and ill," and done "all, except the financial management, that" he could "in anywise do, while others were in the actual management, to make the most complete possible success of the Wilson Sewing Machine Company," for any length of time reasonably sufficient to accomplish any beneficial result. Nor has he attempted to carry out this part of his agreement in good faith. He has not properly assigned and transferred the stock of the Chicago company to the Wallingford company. The evidence shows that the factory was not able to produce three hundred machines per week at any time before filing the bill; and although there is some evidence that it has done so since, in our opinion the evidence does not authorize the conclusion that there were made this number of machines per week, in consecutive weeks, as an average result of the weekly production. Moreover, it was impossible when the instruments were signed, and has been since, prior to the filing of the bill, for Wilson to furnish, properly transferred, so as to vest an unincumbered title to $29,500 of stock in the Wallingford company, and it was then, and has remained and still is, impossible for him to so transfer the $15,000 more of stock in the Wallingford company, which had been loaned to Kirby, so as to vest an unincumbered title.

An attachment suit was commenced by Frank H. Alford, against Wilson, to recover an alleged indebtedness of $5000, in the Superior Court of Hartford, Connecticut, on the 10th day of November, A. D. 1882. The writ of attachment was levied on four hundred shares of the capital stock of the Wilson Sewing Machine Company of Wallingford, Connecticut, then standing on the books of that company in the name of

and belonging to Wilson, as the property of Wilson. On the 30th of December, A. D. 1882, Wilson appeared in the suit, and, on his motion, the suit was transferred to the Circuit Court of the United States for the District of Connecticut, and on the 4th day of January, A. D. 1883, both parties entered their appearance in that court. The cause was continued until the 28th of March, A. D. 1884, when there was a trial by the court, without the intervention of a jury, and on the 3d of May, A. D. 1884, the court rendered judgment in favor of Alford, for $5000, and costs of suit, and awarded execution. Counsel contend, however, this levy was not binding on Wilson, because the service was not in accordance with the statute of Connecticut. But this objection ought to have been urged while the suit was pending. The objection was personal. The effect of the levy was to sequester the stock attached, to await the judgment. (*Davenport* v. *Lacon,* 17 Conn. 278.) Wilson not having urged the objection in the court where the cause was pending, but having entered his personal appearance and gone to trial, waived the objection. (*Harris* v. *S. and K. R. R. Co.* 47 Me. 298; *Raymond* v. *Rockland Co.* 40 Conn. 401.) The description of the stock in the levy was sufficient. *Stamford Bank* v. *Ferris,* 17 Conn. 258.'

The facts in relation to the $15,000 of stock are, briefly, these: At the time of the sale of the stock by Wilson to Roots & Kirby, on the 27th of March, A. D. 1883, Kirby did not have the money to pay the $25,000 for his stock. Wilson agreed to advance Kirby $20,000 of the amount, on pledge of the same stock, if Roots would advance for him the other $5000. Roots assented to this. Wilson and Kirby met in New York on the 7th of April, A. D. 1883, pursuant to a previous agreement between them, Kirby having with him the $5000 which Roots had advanced, pursuant to his agreement. Wilson then proposed to loan Kirby $15,000 of his stock in the Wallingford company, instead of advancing the $20,000 in money, which Kirby could pledge in bank, together with

the $20,000 of his own stock, which he had before agreed to pledge to Wilson to obtain a loan of the $20,000. Kirby consented. Wilson loaned him the stock, and it, together with Kirby's stock, was put in pledge with the bank to secure a loan to Kirby of $20,000 in money, and Kirby obtained the money of the bank, and paid it over to Wilson. Kirby failed to pay the loan when it was due; then, at Wilson's instance, he got an extension of time for ninety days, and the note not being paid at the end of that time, the stock was sold by the bank to satisfy the loan.

It was, under the evidence, no part of the agreement with Roots, that the stock of Wilson should be pledged to raise the $20,000. He was simply to advance to Kirby that amount, on the pledge to him of Kirby's stock. The loaning of Wilson's stock to Kirby was a matter wholly between Kirby and Wilson, and while, at the time these instruments were signed, Roots knew that this $15,000 of stock had been thus loaned and pledged, yet, as we have before indicated, the fair construction of the contract, in our opinion, is, that Roots, although contracting for stock in pledge, did not contract for stock subject to the pledge. He was contracting for so much stock, and proposing to pay full value for it. The undertaking of Wilson to transfer and assign the stock, implies an ability to do so legally.

It is contended by counsel that Roots is estopped to urge the Alford attachment as an objection to the ability of Wilson to assign and transfer the stock so attached, and the grounds urged as constituting such estoppel are, Roots knew of the Alford attachment against Wilson before December 21, 1883; he wrote numerous letters about this stock; made sundry propositions with reference to the bonds, after his knowledge of the attachment suit and of the manner in which Wilson had transferred and deposited the stock. There is no evidence that Roots ever consented that the bonds were sufficiently transferred or assigned, notwithstanding this attach-

ment. On the contrary, the evidence clearly shows that he regarded it as preventing a transfer and assignment of the bonds attached. He manifested an anxiety that the spirit of the agreement should be carried out, by proposing ways by which that objection might be obviated; but Wilson accepted none of them, and it is not claimed that Wilson, in consequence of anything said or done by Roots, placed himself in a position which he would not otherwise have occupied, whereby, if Roots' objection be now allowed, he must suffer injury. Roots did not, by proposing to obviate the objection, waive it. The indispensable elements of an *estoppel in pais,*— *fraud* and *injury,*—are wanting. *Flower* v. *Elwood,* 66 Ill. 438; *People* v. *Brown,* 67 id. 435; *Ball* v. *Hooten,* 85 id. 159; *Noble* v. *Chrisman,* 88 id. 186; *Davidson* v. *Young,* 38 id. 145; *Dorlarque* v. *Cress,* 71 id. 380.

It is not material to inquire whether the form of assignment of the stock was sufficient, since, if the stock was, as we have held, so incumbered that no form of assignment could vest Roots with the present right of possession and control, Wilson was not able to perform his contract,—Roots could not obtain that which he contracted for.

It is contended, in argument, that the existence of the attachments at the time was no impediment to Wilson's undertaking, since he was only required to be able to transfer the stock when the factory was making three hundred machines per week. We can not concur in this view. The undertaking is, that the deposit of stock and bonds shall be made in twenty days, which, on Wilson's part, was absolutely impossible. Besides, in our opinion, the reasonable time within which the factory should make the three hundred machines per week, had expired before the filing of the bill, and at that time the Alford attachment suit was still pending, and the ownership of the $15,000 bonds loaned to Kirby had passed from Wilson.

As to the contention that Roots is estopped to urge any objection to the transfer of the bonds deposited with Gage, the same reply is applicable that is made to the objection that he is estopped to urge the Alford attachment suit.

We may add, that the evidence convinces us that Wilson grossly overvalued the Grand Crossing plant, and the furniture, materials, etc., in the Chicago offices, and misrepresented to Roots the capacity and condition of the factory at Wallingford; but being in doubt whether Roots did not have sufficient evidence to put him upon his guard in these respects, we place our decision upon the ground that Wilson has not complied with his contract, and that, as respects the transfer of the stock, it was impossible for him to do so,—and this justifies setting aside even an executed contract. *Thomas* v. *Coultas,* 76 Ill. 493; *Walker* v. *Denison,* 86 id. 142; *Yost* v. *Shaffer,* 3 Ind. 331; *Shackelford* v. *Handley's Exrs.* 1 A. K. Marshall, 494. See, also, 2 Kent's Com. (8th ed.) 614; *Parham* v. *Randolph,* 4 Howard, (Miss.) 435, (35 Am. Dec. 403;) Chitty on Contracts, (11th Am. ed.) 1089, 1090; *Willets* v. *Burgess,* 34 Ill. 494. But we have before observed, this is an executory, not an executed, contract. Title has not passed to the bonds or to the stock. The granting of the prayer of the bill really only has the effect to restore the possession of the bonds and stocks to the respective owners. In such a contract, the failure of one party to comply with the contract, justifies the other to treat the contract as rescinded, and to take steps accordingly. *Schoonover* v. *Christy,* 20 Ill. 426; *Carney* v. *Newberry,* 24 id. 203; Chitty on Contracts, (11th Am. ed.) 1090-1097.

We see no cause to disturb the judgment of the Appellate Court. It is therefore affirmed.

*Judgment affirmed.*