(Nos. 20186, 20187.—

HARRY L. HAGERMAN, Appellee, *vs.* PAUL SCHULTE *et al.* Appellants.

*Opinion filed June 24, 1932.*

Orr, J., dissenting.

Cutting, Moore & Sidley, and Robert D. Melick, (Charles S. Cutting, and Merritt C. Bragdon, Jr., of counsel,) for appellants Paul Schulte *ct al.;* D. W. Parker, (Franklin J. Stransky, of counsel,) for appellants Gerhard G. Schoneberger *et al.*

RATHJE, WESEMANN, HINCKLEY & BARNARD, (ADOLPH
H. WESEMANN, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The superior court of Cook county rendered a decree in
a cause in chancery in which Harry L. Hagerman was com-
plainant and Gerhard G. Schoneberger and Elsie L. Schone-
berger, his wife, and Paul Schulte and Emma Schulte, his
wife, were defendants, and in which Schoneberger and
Emma Schulte filed separate cross-bills, dismissing both
cross-bills and granting relief to the complainant in the
original bill, referring the cause to a master to take and
state an account between the complainant and the defend-
ant Paul Schulte, and requiring the defendants Paul and
Emma Schulte to convey to the complainant a one-half in-
terest in the premises described in the decree, subject to
such liens and incumbrances of record as shall be found by
subsequent decree to be entered in the cause to be good
and valid liens against the premises, provided that the com-
plainant shall pay to Schulte, within ninety days after the
entry of any final decree in the cause, the amount, if any,
which may be owing by the complainant to Schulte, and if
the complainant shall fail to pay such sum as shall be found
due to Schulte within ninety days his interest in the prem-
ises shall cease and determine. Paul and Emma Schulte
have appealed from the part of the decree which adversely
affects their interest and Gerhard G. and Elsie L. Schone-
berger have appealed from so much of the decree as ad-
versely affects their rights as cross-complainants. The two
appeals have been consolidated.

Paul Schulte is, and has been for many years, a real es-
tate dealer in the village of Oak Park, who bought and sold
real estate and engaged in the erection of apartment build-
ings and bungalows upon his own property. On January 19,
1917, and for some time before, he and his wife, Emma,

owned as joint tenants ten lots in Oak Park, which according to his books had cost him about $15,000, and were, and had been for a long time, vacant and producing no income. Harry L. Hagerman was at the same time a contractor and builder who was engaged in the erection of various apartment buildings and other buildings in Oak Park, and had erected for Schulte a twelve-flat building known as the Eileen building, and several bungalows. Gerhard G. Schoneberger was the general manager of a corporation known as the Auto-Parts Company and resided in Oak Park in a residence subject to two mortgages, the first executed by Schulte before its conveyance to Schoneberger and the second by Schoneberger and wife to Schulte. Schoneberger was also interested with Schulte in the erection of the Eileen building by virtue of a contract with Schulte, by the terms of which Schulte agreed to erect the twelve-flat building according to plans and specifications agreed upon and to convey the premises to Schoneberger for $3000, subject to a first mortgage for $25,000 and to a second mortgage to Schulte for $3560, and upon the sale of the property by Schoneberger Schulte should receive $3560, or so much as should remain unpaid of the second mortgage, Schoneberger $3000, and the remaining profits should be equally divided between the two.

In December, 1916, Hagerman and Schoneberger desired to obtain these ten vacant lots and erect a fifty-eight apartment building, each having an equal interest, and Hagerman had plans prepared for such a building. They asked Schulte if he would be willing to enter into an agreement to construct an apartment building on the ten lots, and Schulte said he would entertain the proposal. He wanted $15,000 cash for the lots. Schoneberger asked him if he would take a second mortgage for the lots and let Schoneberger or Hagerman furnish the first mortgage to cover the cost of the building. He said he would but he wanted more than the cash price, and the price was finally fixed at

$20,000. Hagerman made contracts with various persons for the construction of the building, and the work of construction was begun. Schulte left for California in January and was gone for about two months. On January 19, 1917, before leaving, Schulte and his wife by quit-claim deed conveyed the lots to Hagerman, with the understanding that he was to obtain a loan, if possible, of enough money to pay for the lots and erect the building, but if so large a loan could not be obtained, Schulte agreed to advance whatever money was necessary to complete the building and to take a second mortgage for the price of the lots and the advances. The object of this deed is apparent, and, as his counsel state in their brief, was to avoid any personal liability of Schulte on the notes. An effort was made to obtain a loan of $140,000 but failed, one of the reasons given being that Hagerman's being both owner and contractor might cause embarrassment. When Schulte went to California he left instructions with Paul Smith, who was in charge of his office, to advance funds to Hagerman for pay-rolls on the work and requested Schoneberger to advance money to Hagerman, if necessary. The work progressed in Schulte's absence, and upon his return in March the walls were eight or nine feet out of the ground.

Since no loan could be obtained in the name of Hagerman as owner and general contractor, at Schulte's request Hagerman conveyed the title on March 22 to Schoneberger, in whose name a loan could probably be obtained and who could execute the notes or bonds required, and later the notes and second mortgage, to secure to Schulte payment of the purchase price of the lots and his advances. Schulte and his wife also executed to Schoneberger a quit-claim deed of the lots. Hagerman continued in the construction of the building and Schulte continued to advance the funds necessary for the pay-roll and for payments to contractors, all without any written agreement until April 18, 1917. On that day Hagerman, Schoneberger and Schulte met in the

office of Adolph H. Wesemann, an attorney at law, for the purpose of reducing their agreements to writing, and as a result of their conference with Wesemann two written contracts were dictated by him in the presence of the three parties, by whom they were executed, one between Hagerman and Schoneberger, the other between Schoneberger and Schulte. Each began with the recital that Schoneberger was the owner of the premises in question, "together with the improvements thereon and now being erected." The contract between Schoneberger and Hagerman further recited that Hagerman had been engaged in managing and superintending the construction of the building now being erected on the premises and known as the Wesley Apartments, and is interested in said building or the profits derived therefrom, as hereinafter more specifically set forth; that the parties were desirous of reducing their agreements to writing, setting forth all their respective interests in and to the property or the proceeds or profits to be derived therefrom. It was therefore agreed, first, that Hagerman should receive for all services rendered as superintendent, manager or otherwise and for his interest in and to the building or property, such an amount as is equal to the difference between the actual cost of construction of the building according to the plans and specifications now in existence, and $117,750, it being agreed that the total cost of the building and the improvement of the ground, when completed, should not exceed $117,750, the sum due to Hagerman to be paid when the building shall be completed; second, that the building shall be completed, ready for occupancy, not later than September 1, 1917, all payments for material and labor shall be paid in accordance with the terms and conditions of the contracts for such material and labor and upon the order of Hagerman, and Schoneberger agreed that he would make the payments in accordance with the contracts and upon the order of Hagerman; third, that all money paid by or through Schoneberger in the construc-

tion and equipment of the building and the improvement of the ground shall first be paid to him out of the rents and profits issuing out of the premises or out of the profits realized from the sale of the premises; fourth, that when all of the money paid by Schoneberger shall have been paid to him, then he shall convey an undivided one-half interest in and to all of the premises by warranty deed, subject to the existing liens and incumbrances of record at the time, provided, however, that Schoneberger shall not create or suffer to be created any liens or incumbrances except for the purpose of raising necessary funds for the construction and completion of the building and ground as aforesaid; fifth, in the event that Hagerman shall fail to construct and complete the building and improvements provided, then Schoneberger shall have the right and authority to construct and complete them, and thereupon he shall first be entitled to receive from the rents and profits derived from the building such sum as he shall have been required to pay for and on account of the completion of the building in excess of the sum of $117,750.

The contract between Schoneberger and Schulte, after reciting Schoneberger's ownership, the desire of the parties that Schulte shall represent Schoneberger in the erection of the building and shall superintend its construction, and the fact that he had already advanced considerable money which had been used in the construction of the building and the improvement of the property and will advance further money for the same purpose, continued that it was therefore agreed, first, that Schoneberger has appointed Schulte his attorney in fact to superintend the erection of the building and the improvements and to rent the premises, execute leases and collect the rents and profits derived therefrom; second, that Schulte agrees to superintend the construction and erection of the building and improvements, the building to be erected in compliance with the plans and specifications for its construction and pursuant to a certain contract en-

tered into this day between Schoneberger and Harry L. Hagerman; third, that Schulte will use his best endeavors to rent all apartments in the building as soon as he reasonably may, that he will manage the building, collect the rents and profits, pay all taxes and assessments, keep it fully insured and pay the premium for such insurance, and that he will account to Schoneberger for all rents collected and all expenditures paid by him, and that the balance, if any, shall be retained by Schulte for the purpose of paying to himself a commission of five per cent on all rents collected and all money advanced by him in the construction of the building and the improvement of the property and which upon an account shall be found justly due and owing to him by Schoneberger; fourth, that when the building shall have been fully completed and all claims for labor and material paid, there shall be an accounting between the parties as to the amount advanced by Schulte for the construction of the building and improvements, and the sum found due on such accounting from Schoneberger to Schulte, with six per cent interest, shall be secured by a mortgage or trust deed, and Schoneberger agrees that he will execute his promissory note for the amount due and execute his trust deed or mortgage, signed by his wife, for the full amount of his indebtedness as determined by the accounting; fifth, that until all of the notes specified in paragraph 4 shall have been paid, Schulte shall collect all the rents and profits issuing out of the building in accordance with the provisions of clause 3; sixth, there shall be no conveyance, either voluntary or involuntary, of the premises until the amount advanced by Schulte, and interest thereon, and all other money expended by him in the management of the building, shall have been re-paid, except by his consent; seventh, that all money realized from the sale of any notes or bonds secured by mortgage or trust deed upon the property shall be paid to Schulte, to be used to pay for the material and labor in the construction of the building and to apply upon

money advanced. On the same day the power of attorney mentioned in the contract between Schoneberger and Schulte was executed.

After the execution of these instruments a loan of $115,000 was obtained on April 30 through Mitchell & Co. Schoneberger and his wife executed notes for that amount and a trust deed to the Chicago Title and Trust Company, as trustee, securing them, and on May 10 they executed a second trust deed on the property for $31,000 to secure the payment to Schulte of the purchase price of $20,000 and $11,000 advanced by him. All the contracts for the erection of the building were made by Hagerman with various material men. He hired the workmen, and the work was done by day labor. The construction proceeded until June 15, when Schulte caused Hagerman's arrest on a baseless charge of stealing an automobile, which was dismissed at the preliminary hearing. After that occurrence, Hagerman, who had been occupying Schulte's office with Schulte and Schoneberger, ceased to do so and ceased his daily attendance on the work, giving most of his time to other work and appointing his brother, Elmer, to take his place in overseeing the work. The building was substantially completed in October, the first tenant moving in during the latter part of September. Schulte has been in control of the premises since the completion of the building, has rented them and collected the rents, but has never rendered any account of the rents and of the disbursements or of his advancements for the construction of the building, and the bill charges that he has collected enough rents to pay all the money he has advanced or expended. In December, 1918, he procured a quit-claim deed from Schoneberger and his wife to Schulte and his wife as joint tenants and now claims that they are the owners of the premises in fee simple. Schoneberger, however, claims that this deed was given only as additional security for the payment of the purchase price of the lots and of the advancements made by Schoneberger.

The relations of the parties to this litigation to one another and the property in question must be determined from a consideration of the two written contracts which they entered into at the same time concerning the subject matter of the title to the property, the erection of the building, the financing of the enterprise, the final accounting and settlement of the parties and the disposition of the property, and of the attendant circumstances. Although there were in form two independent contracts, they were, in fact, interdependent, having reference to one another, prepared at the same time in the presence of all the parties with reference to the same subject matter in which all the parties were interested, each party knowing the contents of both instruments, and executed if not simultaneously, practically so. They must be read and considered together and constitute one contract as completely as if written as one instrument in the form of a tripartite agreement signed by all the parties and equally binding on all. The rule is familiar that where different instruments are executed as the evidence of one transaction or agreement they are to be read and construed as constituting but a single instrument. (*Wilson v. Roots,* 119 Ill. 379; *Gould* v. *Magnolia Metal Co.* 207 id. 172.) Two instruments executed by the same parties, relating to the same subject matter, are to be read and construed as constituting a single transaction. (*Kelsey* v. *Clausen,* 257 Ill. 402.) Where two or more contracts are part of the same transaction and relate to the same subject matter, are known to all the parties and are delivered at the same time to accomplish an agreed purpose, such contracts must be construed together as parts of the same transaction; and this is so even though the contracts are not executed between the same parties. *Union Bank and Trust Co.* v. *Himmelbauer,* 57 Mont. 438; 2 Williston on Contracts, sec. 628.

The undertaking evidenced by the two instruments executed by the three men who are the principals in this liti-

gation, though it involved numerous business transactions, the making of many contracts, the construction of a large apartment building and its operation for an indefinite time, was a single, specific enterprise in which they engaged for their joint profit without any actual partnership or corporate designation. The enterprise therefore fell within the definition of a joint adventure as an association of two or more persons to carry out a single business enterprise for profit. (*Fletcher* v. *Fletcher,* 206 Mich. 153.) A joint adventure has been said to be a commercial or maratime enterprise undertaken by several persons jointly; a limited partnership—not limited in the statutory sense as to the liabilities of the partners but as to its scope and duration. (*Peterson* v. *Nichols,* 90 Wash. 398.) A joint adventure is not identical with a partnership. While a joint adventure is not regarded as identical with a partnership, the relation of the parties is so similar that their rights and liabilities are usually tested by the rules which govern partnerships. (*Keiswetter* v. *Rubenstein,* 235 Mich. 36.) The relation between joint adventurers is fiduciary in its nature, and their conduct to one another must be governed by the utmost confidence and good faith. *Irvine* v. *Campbell,* 121 Minn. 192; *Lind* v. *Webber,* 36 Nev. 623.

The contention of the Schultes is that the case alleged in Hagerman's bill is only for the specific performance of the contract between him and Schoneberger, to which they were the only parties; that there was no joint adventure in which Hagerman was a party with Schoneberger and Schulte, no fiduciary relation existed among them, and no obligation on Schulte's part to account to Hagerman for anything. His claim is that Hagerman agreed to complete the building not later than September 1 and at a cost not exceeding $117,750, and he did neither but abandoned the work before its completion; that it was not completed until after September 1 and that it cost more than $117,750, and therefore Hagerman cannot have a decree for specific

performance and has no right to an accounting by Schulte or any other right against him.

Hagerman's right did not originate in the contract executed by him and Schoneberger. Long before April 18, 1917, the parties entered upon their joint adventure. No written contract was necessary for the purpose. The parol understanding which existed at the time Schulte conveyed the property to Hagerman on January 19 was sufficient. Schulte wanted to sell—at least was willing to sell—the ten lots, which had cost him $15,000, to Hagerman and Schoneberger for that much cash, or he was willing to convey them to Hagerman and Schoneberger at the price of $20,000 for the purpose of erecting a fifty-eight apartment building on them, the money for which should be secured by a loan for which he should not be personally liable, secured by a first mortgage on the lots, and if a loan could not be obtained for enough to complete the building he was willing to advance whatever sum was necessary to make up the deficiency, and to accept as security for the payment of the $20,000 purchase money and whatever sum he should advance for the erection of the building, a second mortgage on the premises. No claim is made that Schulte was overreached or deceived in any particular in regard to this transaction or that any fraud was perpetrated on him or attempted. These men could not have deceived him if they had attempted to. The business in hand was such as he thoroughly understood. He was not obliged to make this contract if he did not want to, but he made it understandingly. Nobody except Schulte knows whether it was a good trade or a bad trade, and nobody else will know until he has made an accounting. The agreement constituted the parties to it joint adventurers. *Keiswetter* v. *Rubenstein, supra; Elliott* v. *Murphy Timber Co.* 117 Ore. 387.

Schulte and his wife were the owners of the lots in joint tenancy. Upon the conveyance to Hagerman before Schulte's departure for California he became the owner of

the legal title in trust for the benefit of the three joint adventurers, Schulte, Schoneberger and Hagerman, and was bound to the same degree of care and diligence, honesty and good faith as equity always requires between trustee and *cestui que trust*. Upon the failure of Hagerman to procure the loan and the transfer of the title to Schoneberger the latter became the holder of the legal title but there was no change in the equitable interest, and upon the execution of the trust deed he continued to hold the equity of redemption in trust for himself and the other two sharers in the joint enterprise according to the agreement. Until the execution of the instruments of April 18, 1917, the partners in the joint enterprise had gone along in accordance with their agreement, with no writing stating definitely its terms, and after their execution they continued in the same course of action. Hagerman continued to oversee personally the construction of the building until the disagreement between him and Schulte about the automobile and his arrest caused by Schulte's charge of larceny against him. Thereafter Hagerman was only occasionally at the building but depended on his brother to oversee the work, and on Schulte, who was giving his personal attention to it. Nevertheless the joint adventure was carried to a successful issue. The erection of the building and the improvement of the lots were completed, the apartments were rented, Schulte collected the rents and paid the taxes, and after he received the quit-claim deed from Schoneberger has claimed that he and his wife are the owners in joint tenancy of the property in fee simple and has refused to render any accounting.

It is claimed on behalf of the Schultes that the bill is merely a bill for the specific performance of a contract between Hagerman and Schoneberger; that Hagerman abandoned the contract two months before the time fixed for its completion and never did complete it, and was therefore not entitled to a decree of specific performance. The

bill was more than a bill for specific performance. It was a bill for the settlement of the rights of the parties in the joint adventure, for an accounting by that one of the parties who had received all the proceeds of the venture, for the setting aside of the conveyance of the premises by Schoneberger, who held the property in trust for the benefit of his associates and himself as *cestuis que trustent,* and for compelling a conveyance to the complainant.

It may be that the bill in the form in which it was originally filed should be regarded as a bill for the specific performance of the contract of April 18, 1917, between Hagerman and Schoneberger, but a demurrer was sustained to that bill and it was amended. A demurrer was also sustained to the amended bill and it was again amended. Both the original bill and the amended bill failed to state the facts occurring in December, 1916, and in the first four months of 1917, by which the parties embarked upon the joint adventure with no written agreement but only a verbal understanding. These facts were supplied in the amended bill of complaint, which the defendants answered and on which the cause was heard. They are the following: That on or before January 19, 1917, Paul and Emma Schulte were owners in fee simple, as joint tenants, of the ten lots in controversy and were desirous of selling them in excess of their market value. The complainant had for a long time been engaged in the contracting business and as superintendent of construction of certain apartment buildings in Oak Park and continued so engaged to the date of filing the bill. The defendant Schoneberger was engaged in the promotion of enterprises and improvement of real estate and furnishing financial aid for the making of improvements. About that time the complainant and Schoneberger entered into a verbal agreement that they or either of them would acquire title to the lots from Schulte and his wife for the purpose of erecting an apartment building for the mutual benefit and advantage of the complainant and

Schoneberger, the complainant to be superintendent and Schoneberger to secure funds for the erection of such building by getting a loan to be secured by trust deed or otherwise, the complainant to receive for his services in connection with the building the difference between its actual cost and $117,750 and in addition an undivided half interest in the premises, and Schoneberger to have a like half interest. Pursuant to that agreement the complainant acquired title to the premises described, from Schulte and his wife, by warranty deed dated January 19, 1917. Schulte and his wife were to receive as payment for the premises a purchase money note of the purchaser for $20,000, to be secured by mortgage or trust deed upon the premises and improvements, inferior only to such other lien as was necessary to secure enough money to pay for the construction and completion of the building; that to better enable Schoneberger to secure necessary money for the building and improvements, the complainant and his wife, with the knowledge, consent and approval of Paul and Emma Schulte, conveyed the premises to Schoneberger by warranty deed dated March 22, 1917; that it was the duty of Schoneberger to hold title for the joint use of the defendants and the complainant. About April 18, 1917, Schoneberger, while holding title to the premises, for the purpose of reducing the oral agreement to writing, entered into the written contract with complainant dated April 18, 1917, which has been mentioned; that simultaneously with the execution of this contract, Schoneberger, in order to raise money for the erection of the building and improvements, entered into the written contract dated April 18, 1917, with Schulte, who then knew the terms and provisions of the contract between Schoneberger and the complainant bearing the same date. The amended bill alleged the procuring of the $115,000 loan and the execution of the trust deed to the Chicago Title and Trust Company and the execution of the note and second mortgage to Schulte, and continued

that the premises, unimproved and unoccupied on January 19, 1917, are now improved by a three-story-and-basement brick apartment building containing twenty-two five-room apartments and thirty-six four-room apartments, known as the Wesley Apartments, all now occupied by tenants; that the annual gross rentals from the premises aggregate approximately $40,000, the interest on the incumbrance and necessary expenses of management approximate $20,000, leaving a balance of approximately $20,000, which the complainant is informed and believes is being wrongfully appropriated by Paul and Emma Schulte for their own use and benefit, of which the complainant is entitled to one-half under his agreement. Prior to April 18, 1917, the complainant procured plans and specifications, which were approved by Schulte and Schoneberger, employed necessary help to excavate the basement and began construction of the building, and about April 18, and thereafter, secured bids for various materials to be used in the building and entered into contracts for their delivery, and contracted for the delivery of the cut stone, plaster, millwork, glass, electrical work, cement work, roofing and other matters, all of such contracts amounting to the sum of $75,000. He superintended and managed the construction of the building, inspected materials, hired labor, passed upon all bills, graded the lawn around the building, purchased screens, window shades, gas fixtures and other appurtenances, and completed the building in a good and workmanlike manner, ready for occupancy, on or about the first day of September, 1917. Schoneberger and Schulte claim the cost of the building and improvements exceeds the sum of $117,750, but the complainant is not informed as to the exact cost and alleges the fact to be that the cost does not exceed the sum of $117,750. The complainant was for approximately six months engaged in securing the material and labor and supervising the work in connection therewith and has received nothing for his services, but Schulte and

Schoneberger have conspired and confederated together to deprive him of his one-half interest in the premises, of rents, issues and profits and the fruits of his labor. The fair cash market value of the premises described was $10,000 at the beginning of the joint venture and Schulte received $20,000, then evidenced by Schoneberger's note bearing six per cent interest, secured by a trust deed to Schulte, trustee, inferior only to the trust deed to the Chicago Title and Trust Company, and it should be paid if application had been made of the rents by Schulte, and the fair cash value of the premises now is in excess of $175,000. The prayer was for an accounting by all the defendants and the payment by them of the amount found due the complainant, the appointment of a receiver, the setting aside of the deed from Schoneberger to Schulte, that Schoneberger be decreed specifically to perform his agreement with the complainant and to make and to convey to him a one-half interest in the premises, and that the complainant may have such other and further relief as equity may require.

It is true that the complainant prays that Schoneberger be decreed specifically to perform the contract, but the bill also prays for general relief and sets out all the facts which entitle the complainant to relief. In such a condition of the pleading, if the bill alleges facts which would not entitle the complainant to the specific relief prayed for but which do entitle him to other or different relief, the court will decree him the relief which equity and justice require under the prayer for general relief. Schulte's contention is that Hagerman by his bill has limited himself to the specific performance of the single contract between him and Schoneberger; that he had no other interest in the enterprise than the difference between $117,750 and whatever less amount he could complete the improvement for; that the improvement cost more than $117,750 and was not completed by September 1, and that Hagerman abandoned the work, and therefore he cannot maintain a bill for specific performance.

We have already held that this is too narrow a view of the relation of the parties; that Hagerman's connection with the enterprise is not limited to the terms of the contract with Schoneberger, but the two contracts of Schoneberger, first with Hagerman and next with Schulte, are parts of the same transaction, must be read together as one contract, whose terms are equally obligatory on all three of the parties and must be considered with reference to the fiduciary relationship of Schulte and Schoneberger to Hagerman.

By the two contracts read together, every part of each binding on all the parties, Hagerman undertook to construct and complete the building for $117,750 and was entitled to receive that amount even though the construction did not cost so much, and retain the difference. He was also entitled by the fourth paragraph of the Schoneberger contract, when all the money advanced by Schoneberger or Schulte had been re-paid, to a conveyance of an undivided one-half of the property, subject to the liens and incumbrances of record at the time. By the fifth paragraph it was provided that if Hagerman should fail to construct and complete the building and improvements as provided, then Schoneberger—that is, Schoneberger and Schulte—should have the right and authority to construct and complete them, and thereupon should first be entitled to receive from the rents and profits derived from the building such sum as they shall have been required to pay on account of the completion of the building in excess of $117,750. What does "first" mean here except before conveying the undivided interest to Hagerman? Indeed, the fifth paragraph seems entirely supererogatory except to provide that the fact of the cost of the construction exceeding $117,750 shall not deprive Hagerman of his right to a conveyance of the undivided half of the property. Both paragraph 5 and paragraph 1, which provide that Hagerman shall receive for all services rendered as superintendent, manager or otherwise

and for his interest in and to the building or property such a sum as is equal to the difference between the actual cost of construction and $117,750, must be considered together, and when they are considered together their apparent inconsistency disappears, for the two together mean that Hagerman shall have, when the work is completed and paid for and all the money advanced by Hagerman and Schulte has been re-paid, a conveyance of an undivided half of the property, and if he completes the work for less than $117,750 he shall have the difference. Both the cost of construction and completion of the work were affected by changes of plan and by extra work added by agreement of all the parties. Neither the total cost, nor the cost added by reason of the changes in plan and extra work agreed on, can be determined from the evidence in the record.

More than a year after the completion of the building, during which Schulte had been in possession of the property, renting it and collecting the rents, Schoneberger and his wife on December 19, 1918, executed to Schulte and his wife a quit-claim deed of the property. In Schulte's answer it was alleged that the consideration of this quit-claim deed was $1000 then paid to Schoneberger, and he testified that the deed was intended to extinguish any interest of Schoneberger in the property. He testified at one time that he paid the consideration by a check of $500, another of $410, and the cancellation of a coal bill for $90, and that nothing else was paid. Later he testified that in this connection he released the mortgage on Schoneberger's home, that the reporter had made a mistake in showing that he had paid $1000 for the deed and had given two checks for $910 and a coal bill for $90, and that the deed cost him $2187.13. The $90, he said, was made up of a coal bill for $23.50 and another item for $66.50 interest. Schoneberger produced evidence to show that the interest item had been paid previously. The master found that after a part of this testimony had been taken, pencil figures

in one of Schulte's books had been changed in Schulte's handwriting, apparently to add to the cost of the property $2000 claimed to have been paid for the quit-claim deed. Schoneberger testified that the deed was executed at Schulte's request as additional security for money advanced by him, as well as to enable him to close more expeditiously a negotiation which he said he had pending in California for the sale of the property. Schoneberger further testified that at this time he was also reimbursed by Schulte for $2000 which he had advanced in the early days of the venture, during Schulte's absence in California, by Schulte's checks for $910 and his release of Schulte's second mortgage on Schoneberger's house, on which about $1200 was due. Schulte's books show that during the whole year 1919 Schoneberger's account was charged with five per cent commission on the rents of the building collected, and no release was given to him of his liability on the notes secured by the trust deeds on the building. Since the sharers in the joint adventure sustained a fiduciary relation each one to all the rest, their dealings with one another were subject to the rule that where one who sustains a fiduciary relation to another acquires from that other an interest in the property in regard to which the fiduciary relation exists, the burden rests upon the one acquiring the interest to show by clear and convincing evidence that he exercised perfect good faith in the transaction by which his interest was acquired. Transactions between persons in this relation are presumptively fraudulent and void. Courts of equity scrutinize them very closely, and before such a contract will be permitted to stand the proof must be clear that good faith has been exercised and confidence has not been betrayed. (*Mors* v. *Peterson,* 261 Ill. 532.) All the evidence considered, it is not clearly shown by satisfactory proof that Schulte's conduct in the acquisition of the trust deed from Schoneberger was marked by good faith and honesty of purpose.

Schulte insists upon the defense of *laches* as a bar to both the bill and the cross-bill. So far as Hagerman is concerned, his bill was filed on May 13, 1921, about three and a half years after the completion of the building. The law is well settled that actions asserting title to land will not be barred by mere delay for any period short of that fixed by the Statute of Limitations. It is only when the delay is accompanied by some other element rendering it inequitable to permit the owner to assert his title that *laches* will bar the right within the statutory period of limitation. (*DeProft* v. *Heydecker,* 297 Ill. 541; *Schultz* v. *O'Hearn,* 319 id. 244.) Schoneberger's deed to the Schultes was made December 19, 1918. He was made a defendant to Hagerman's bill filed on May 13, 1921, was personally served and made default on November 28, 1923. This default was set aside with Hagerman's consent and Schoneberger filed his answer on October 21, 1924. In the Schultes' reply to Schoneberger's answer to their petition for rehearing they say that they have never claimed that Schoneberger was absolutely barred by technical *laches,* and clearly he was not. No statute of limitations barred him and nothing had occurred to make it inequitable for him to assert his right if he had any, though his conduct in permitting the default to be taken and neglecting to take any action to defend the rights he is now claiming might be taken into consideration as a matter of evidence in determining the validity of his claim.

The evidence in this case was voluminous, in some instances vague, uncertain and contradictory. We have not set it out at length, for to do so would unduly lengthen this opinion. We have given it our consideration. Our conclusion has been stated that the three men were engaged in a joint adventure; that the two instruments of April 18, 1917, are the evidence of the agreement of the three parties; that a fiduciary relation existed among them, each with the other two; that Schulte, who had the actual possession

of the physical property involved, and Schoneberger, who
held the legal title and was personally liable for the incum-
brances on the property, were bound to account with one
another and with Hagerman for the rents and profits, and
that the deed of Schoneberger to Schulte should be held
to be a mortgage to secure the advances made by Schulte.
No argument has been made as to the decree dismissing
the bill of Emma Schulte, and it is therefore affirmed. The
remainder of the decree is reversed and the cause is re-
manded to the superior court of Cook county, with direc-
tions to enter a decree referring the cause to a master to
take an account of all money advanced or expended in the
construction of the building upon and the improvements of
the premises in question; of the cost of such building and
improvements without extras; of all money advanced or
expended by Schulte in excess of $117,750; of all rents
and profits of the premises which have been collected by
or on account of Schulte; of all money disbursed or ex-
pended on account of the management, maintenance and
care of the building; of all money paid by Schulte on ac-
count of the principal and interest of the notes secured by
the trust deed registered in the office of the registrar of
Cook county as document No. 73430, or any other notes
the proceeds of which were invested in the premises in
question; of all money paid by Schulte on account of the
principal and interest of the bonds secured by the trust deed
registered in the office of the registrar of Cook county as
document No. 73362; of all money due to Schulte, if any,
on account of the purchase price of the premises; to state
such other account as may be necessary to determine what
sums of money may be due by Hagerman and Schoneberger,
or either of them, to Schulte, or what sums of money may
be due from Schulte on account of rents collected (less
commissions provided for by contract) by Schulte to Hag-
erman and Schoneberger, or either of them, if any; order-
ing the parties hereto, respectively, for the better discovery

of the matters aforesaid, to produce before the master, and to leave with him when specifically directed, all books, papers and writings in their custody or under their control relating thereto, and to be examined upon oath and interrogatories as the master shall direct; directing the master to cause to come before him all such witnesses whose testimony he may deem necessary and examine them upon oath and interrogatories touching the accounts; ordering the master to report herein with all convenient speed; that he, or either of the parties, be at liberty to apply to the court for further directions, and reserving the consideration of costs and all other matters not herein expressly provided for until after the master shall have made his report.

*Reversed and remanded, with directions.*

Mr. Justice Orr, dissenting:

I cannot agree with the conclusions reached in the foregoing opinion based upon the theory that Hagerman, Schoneberger and Schulte were joint adventurers or partners for a limited purpose. So far as Hagerman is concerned, his bill of complaint is not framed on that theory. On the contrary, his bill sets out only a joint adventure or partnership between himself and Schoneberger for their mutual benefit. By Hagerman's bill he and Schoneberger were apparently each to emerge with a half interest in the property to be bought by one or both of them and improved by their joint efforts. Schulte is described only in a separate written contract with Schoneberger, and the bill proceeds on the theory that Schulte never had any interest in the joint adventure of Hagerman and Schoneberger except to receive the purchase price of the lots bought from him and the money which he had advanced to complete the building and put it in operation. Thus, so far as Hagerman is concerned, it is apparent that his bill of complaint failed to state a joint adventure or partnership which included Schulte. Hagerman, to recover at all, must recover on the

case made by his bill, and cannot state one case in his bill and make a different one by the proof. (*Howard* v. *Burns,* 279 Ill. 256; *Sharkey* v. *Sisson,* 310 id. 98.) Therefore, as to Hagerman, the relief granted by the superior court was not warranted either by the law as applied to the facts or by the allegations of the bill.

A consideration of the claims made by Schoneberger reveals that his position rests almost entirely upon the proposition that a joint adventure and fiduciary relationship existed between the three parties. But an examination of the evidence shows conclusively that the parties themselves did not so regard their relationship. Hagerman and Schoneberger both testified that they were partners in the undertaking, but there is no testimony by anyone that Schulte was a partner. Thus, Schoneberger said: "Hagerman and I were partners. Schulte was to watch that everything was taken care of. He was working for himself." And further: "Hagerman and I agreed we were fifty-fifty partners and were to buy the lots from Schulte for $20,000 clear, he to turn over the title in fee and advance any money that was necessary until the loan was made." Hagerman's testimony likewise shows that his partnership agreement was with Schoneberger. The record shows that Hagerman and Schoneberger attempted to borrow $140,000 on the lots and building without putting any money in it themselves, and by erecting the building for $117,750 or less they expected to own the equity as tenants in common, but when they started construction and found they could only borrow $115,000 on it they were forced to rely upon Schulte for practically all of the additional financing. From all the evidence in the record it is clearly apparent that Schulte was dealing for himself in order to protect his investment in the land and the money necessarily advanced to erect the building and that he was not a joint adventurer with either Hagerman or Schoneberger, who were co-partners for expected profits which did not materialize. Notwithstanding

the fact that the paper title to the real estate was shuffled about at different times from Schulte and wife to Hagerman, thence to Schoneberger, and later back to Schulte and wife again, it is undisputed that Schulte was the real owner of the lots at all times, that no money consideration passed for the deeds from the Schultes to Hagerman and thence to the Schonebergers, and that Schoneberger was a mere dummy or straw-man, whose principal contribution was that of lending his name for the vesting of title during the financing and construction period. Schoneberger testified that he had told Schulte he could have a deed any time he wanted it, and did not hesitate to re-convey the property back to Schulte in 1918 for a valid consideration, consisting of about $1000, to re-pay him for money advanced and the release by Schulte of a mortgage on Schoneberger's home. This in itself was evidence of an accounting or settlement between Schulte and Schoneberger. At this time Schoneberger made no claim to any further interest in the property. In fact, he did not claim any interest until 1924, nearly six years later. Schoneberger was made a party to Hagerman's original bill in 1921 and was personally served with process at that time but suffered a default to be taken against him. It was not until October 21, 1924, that he asked to have this default set aside and was given leave to file his answer and cross-bill, by which he claimed a half interest in the land and 58-flat building. The record further shows that in May, 1920, while a witness in another court proceeding, Schoneberger was particularly questioned regarding this 58-flat building and then said he had no interest in it. As contrasted with the admitted nominal interest which Schoneberger had in the property, the evidence shows that Schulte not only furnished the ten lots (which had cost him $15,000) at a stipulated price of $20,000, for which he took a second mortgage, but also advanced the money required above the $115,000 borrowed to complete the building and gave three months of his time

to supervise its completion. Schulte was the only one who had any substantial investment in the property outside of the mortgagees who held the $115,000 loan, which he has since paid off. Schoneberger voluntarily re-conveyed his paper title to Schulte in 1918, and at that time was apparently reimbursed for any money he had advanced in the undertaking. At no time did Schoneberger have any such substantial interest as would entitle him to a conveyance of an undivided one-half interest in this valuable property which he claimed under his cross-bill. Under these circumstances it seems highly inequitable to disturb the finding of the chancellor, who held that Schoneberger was neither entitled to specific performance nor to an accounting, and dismissed his cross-bill.

The record further shows that Hagerman abandoned the superintending of the building over three months before its completion and thereafter spent most of his time on other jobs. With money advanced by Schulte, and under his general supervision, the building was substantially completed in October, 1917. For a period of nearly three and one-half years after the completion of the building neither Hagerman nor Schoneberger ever suggested that they, or either of them, were entitled to any interest in the building. As an explanation of Hagerman's leaving the job over three months before it was completed, the master found "it was evident that the building cost would run over $117,750, so he [Hagerman] would earn nothing by staying." The proof shows that Hagerman abandoned the work and failed both to complete the job at the price stated and within the time stipulated. There can be no relief by enforcement of a contract where the complainant has failed to perform his part thereof or has abandoned the contract. *Lasher* v. *Loeffler,* 190 Ill. 150; *Weingaertner* v. *Pabst,* 115 id. 412; *King* v. *Walrath,* 313 id. 551; *Stuckrath* v. *Briggs & Turivas,* 329 id. 555.

The contract between Hagerman and Schoneberger could not have been specifically enforced by Schulte against Hagerman, not only because Schulte was not a party to it but also because it was essentially a contract for personal services. Since it was not enforceable against Hagerman it likewise cannot be enforced specifically against Schoneberger or Schulte. Before specific performance of a contract to convey real estate can be enforced the contract must be capable of enforcement by either party as against the other. (*Welty* v. *Jacobs*, 171 Ill. 624; *Ulrey* v. *Keith*, 237 id. 284; *Barker* v. *Hauberg*, 325 id. 538.) The inability of Schulte to obtain relief by specific performance is only another reason why it is now inequitable to grant relief to Hagerman against Schulte.

For the reasons briefly stated I believe that Hagerman's amended bill should have been dismissed for want of equity.