(No. 31512.—

CHARLES G. DITIS, Appellant, *vs.* AHLVIN CONSTRUCTION Co. *et al.,* Appellees.

*Opinion filed January 18, 1951—Rehearing denied March 19, 1951.*

WILLIAM S. KLEINMAN, and WERNER W. SCHROEDER, both of Chicago, for appellant.

MAYER GOLDBERG, LEONARD L. LEVIN, and FRISCH & FOX, all of Chicago, (HENRY I. GREEN, of Urbana, of counsel,) for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

On May 7, 1945, appellant, Charles G. Ditis, filed a complaint in equity in the circuit court of Cook County, against the Ahlvin Construction Company, a corporation, Martin V. Ahlvin, Jorgen Hubschman and Vernon E. Crosell, the stockholders, directors and officers of the corporation, and the Trust Company of Chicago, as trustee. He sought an accounting relative to 97 houses constructed and sold by the corporation, and the recovery of his property, property rights and interest in 80 of said houses of which he claims to have been wrongfully deprived by Ahlvin, Hubschman and Crosell, when the two latter directors were allowed to purchase the 80 dwellings from the corporation. The chancellor, having heard the evidence, found that appellant had no interest in the real estate; that the sale to the two directors was valid, inasmuch as they had no fiduciary duty toward appellant; that appellant was entitled, by contract, to 37½ per cent of the profits realized from the sales of all houses by the company; and ordered an accounting. Appellant took a direct appeal to this court, which we transferred to the Appellate Court for the First District because no freehold or other grounds were involved so as to give us jurisdiction on direct appeal. (*Ditis* v. *Ahlvin Construction Co.* 400 Ill. 77.) The Appellate Court affirmed the decree of the trial court, (*Ditis* v. *Ahlvin Construction Co.* 339 Ill. App. 378,) and we have granted leave to appeal for further review.

Since the facts detailed in our former opinion are limited to those bearing on the question of jurisdiction, some further description of the relationship between the parties and the transaction involved becomes necessary. In the early part of 1942 the Strandberg & Ahlvin Construction Company was a corporation with little business and few assets. Strandberg withdrew and the name was changed to Ahlvin Construction Company on January 13, 1942, with appellee Ahlvin becoming president. On the same day

Ditis was appointed a director and elected vice-president and secretary. He claims that he became a stockholder at the time, but this is denied by Ahlvin. No conclusive documentary evidence was introduced to prove or disprove the point; however, minutes of a special meeting of the shareholders, dated July 8, 1942, recite that Ditis was one of the shareholders present. We gather that Ditis was taken into the company, without investment of capital, as the result of his having conceived and approached Ahlvin with the idea that the company go into the business of building homes for war workers under the authority of the War Production Board. Ahlvin was receptive to the scheme and the two men set about to put the plan into being. All matters in dispute in this litigation arise from this enterprise conceived by Ditis.

Property upon which to build was located and secured by a contract of purchase, preliminary plans were drawn by an architect, a lending agency was secured to underwrite a loan of $5400 on each dwelling erected, title arrangements were made, and other required preliminary negotiations were completed to the satisfaction of the War Production Board. As a result, on June 23, 1942, the Ahlvin company was issued priorities to construct three hundred houses, which were to be sold to war workers, or to third parties for occupancy by war workers, for $6000 cash or for $6250 if the purchase was financed. The degree for which Ditis was responsible for these accomplishments is disputed in the record but the evidence shows that it was largely his successful efforts which transformed the enterprise from an idea into an operation. It is apparent, too, that at this stage of the transaction, the Ahlvin company had not the necessary finances to embark upon the actual construction.

On July 8, 1942, Crosell, a public accountant, who had been the company's auditor for a number of years, was taken into the corporation and made a director and treasurer. The

record does not show if he became a stockholder at that time, or if he paid any consideration for his entry into the firm. During the same month a land trust was created, and by its terms the Trust Company of Chicago was to hold title as trustee, for benefit of the Ahlvin Construction Company, to certain of the lots on which one hundred dwellings were to be erected. At its execution the trust covered only eight lots but as new lots were purchased by the company they were to be added to this trust. The trust agreement provided that no beneficiary should at any time have any right, title or interest in, or to any portion of, the real estate covered by the trust, either legal or equitable, but only an interest in the earnings, avails and proceeds thereof, and that the rights of such interested parties should be deemed to be personal property.

Hubschman, who had a construction company of his own, became connected with the enterprise on September 14, 1942, when he became a director and vice-president of the Ahlvin company, replacing Ditis who resigned both offices but continued as secretary. Although he admits that he was first approached by Ditis, Hubschman testified that his primary purpose for coming into the Ahlvin company was to share in a war contract the company had in the State of Virginia, and that to do so he had to agree to join in the housing project. It is not clear as to whether he became a stockholder at the time, but on October 15, 1942, he put $8800 into the Ahlvin company and advanced $1200 to Crosell to purchase stock from the retired Strandberg.

Another point worthy of note is, that on September 14, 1942, Ahlvin, Hubschman and Crosell, acting as directors, fixed their respective salaries as officers at $1000 each for a period of three months. At the end of the three-month period the figure was reduced to $550 each per month, and it appears that all of said salaries were paid. Previous to this time neither Ditis nor Ahlvin had drawn any salaries from the corporation. The next step occurred on October

25, 1942, when, pursuant to a resolution of the directors, the Ahlvin company entered into a contract with Ditis, which described the relation of the parties as that of employer and employee. The contract recited Ditis's past service in the plan to erect 300 houses, the need of his full time future services, his duties, and then stated, "instead of being paid a fixed salary by the employer, the employee shall receive as and for his services payable by the employer, thirty-seven and one-half per cent (37½%) of the net profits derived from the sale of said premises; or, in the event said premises are not sold, then thirty-seven and one-half per cent (37½%) of any and all equities that remain in any of the unsold dwelling houses. The compensation shall be paid upon the termination and sale of each individual dwelling house." Ditis testified that upon signing the contract he surrendered his stock in the corporation to Ahlvin because he was to devote his full time to the one project.

The next action of the company was to execute and deliver assignments of the beneficial interests in the land trust previously created. By separate assignments Ahlvin received 26 per cent, Crosell 15.625 per cent, Hubschman 20.875 per cent and Ditis 37.5 per cent of the beneficial interest in the trust. These assignments were never delivered to, or brought to the attention of, the trust company. Ditis stated they were not delivered because of Crosell's advice that to do so would subject both the company and the individuals to an income tax liability. Crosell denies this and from his testimony implies that the assignments were signed at the insistence of Ditis with no intention that they would be effective unless the parties financed the project in proportion to their beneficial interest. This, however, is not borne out either by the terms of the assignments or the future actions of the company.

From this point on it appears that Ahlvin was absent in Virginia and had little to do with the housing project,

and, because of events in Virginia and financial difficulties, fell into Hubschman's bad graces. Ditis continued to performed his assigned duties on the housing project, the extent of which is disputed, but he, too, seemed to fall from the inner circle of the Ahlvin company. In the summer of 1943, the subject of the assignments of the beneficial interests in the trust, which were evidently in Ditis's possession as secretary, was raised again. According to Ditis, Huschman and Crosell asked for the assignment to Ahlvin, saying that the latter did not deserve to participate in the housing project because of his failure in Virginia. Ditis testified that he became suspicious, had photostatic copies made of assignments to Ahlvin, Crosell and Hubschman, then placed the originals in the vault, from whence they disappeared. He retained the original of his own. Crosell's version of what occurred is quite different. He testified that Ditis voluntarily agreed that all of the assignments should be surrendered and destroyed when he was told he would have to put up sufficient money to finance his proportionate share in the project; that Ditis failed to deliver up his own assignment, and that he, Crosell, tore up the other three. Despite Crosell's testimony, we note that on September 8, 1943, the corporation adopted a resolution which authorized Hubschman and Crosell to modify or execute a new agreement with Ditis "relative to the beneficial interest that is to be paid to him."

Thereafter, in November, 1943, the Ahlvin company acquired title to ninety-two additional lots. Instead of causing title to be conveyed to the trustee under the land trust previously created, Hubschman and Crosell, acting without a corporate resolution, created a new land trust as to these lots, again with the Trust Company of Chicago, who held title for the benefit of the Ahlvin Construction Company. Though Ahlvin was still president of the company at the time, he knew nothing of the formation of the new trust, and we think it apparent from the evidence that the fact

was concealed from Ditis, the secretary. Without going into a detailed account of the varied transactions which followed, by September 30, 1944, the entire beneficial interest in both trusts had been assigned from the construction company to Hubschman and Crosell, and all of the assignments effecting the transfer had been delivered to the trustee. During the period these events were occurring, Ahlvin, Hubschman and Crosell were the sole directors and had become the only shareholders of the construction company. From the corporate records it is apparent that Ahlvin knew of, and participated in, the assignments, but Ditis, who was still secretary, neither participated in nor had knowledge of what was transpiring.

In the meantime, the construction was progressing. The first sixteen houses completed were sold but no adjustment was made with Ditis under his contract, because, as Hubschman explained, the net profit on each single dwelling could not then be ascertained. By early 1945 eighty-one additional houses were completed, and were rented with the exception of one occupied by Ditis. Three lots of the one hundred purchased were returned to the seller, the remaining two hundred priorities were surrendered voluntarily, and the construction end of the project was terminated with a total of ninety-seven houses having been built.

There is much argumentative evidence in the record as to the scope and importance of the duties performed by Ditis after his contract had been entered into. Appellees seek to discredit both the quality and quantity of his work, but there is sufficient evidence to show that Ditis performed all tasks assigned to him and devoted full time to the project, all without pay. To provide some relief for his financial strait, he was given and assumed the job of watchman on the project, and as such was paid twenty-five dollars a week salary, and given ten dollars expenses for his car. Appellees contend here, as they did in the lower courts, that there was an oral cancellation of the contract by Ditis and that

he accepted the watchman job in lieu of his rights under the contract. Our examination of the record convinces us that the Appellate Court properly decided that there was no cancellation, for the reasons adequately expressed in its opinion. (339 Ill. App. 378.) We shall not comment on this point at any greater length.

On January 20, 1945, unbeknown to Ditis, a special meeting of the board of directors was held at which Ahlvin, Hubschman and Crosell were present. A resolution was passed by all three directors selling the equity in eighty of the unsold houses to Hubschman and Crosell for $45,000, or a net cost to them of $5860 per house, the sale price of which to war workers was to have been $6000. To pay this amount Hubschman was to apply the sum of $24,078.24 due on a note he held from the construction company; Crosell was to apply the sum of $13,643.02 due him on a similar note; and the balance of $5698.24 was to be paid in cash. Hubschman and Crosell both established by their oral testimony that they had advanced the sums represented by the notes to the company in order to complete the dwellings here in question. This is not borne out by documentary evidence in the record, nor were the alleged advances traced to the housing project. Following the resolution, a deed order was given the trustee and deeds for the eighty properties were issued to Hubschman and Crosell on February 28, 1945. They were recorded March 14, 1945. Four days later Ditis was tendered a statement summarizing the costs of the project and asked to approve it. The statement showed that the project had operated at a net loss of $19,383.00, making worthless Ditis's contractual interest of thirty-seven and one-half per cent (37½%) of the net profits. Ditis was offered a deed to the house he was occupying if he would approve the report, but he refused, and this action followed on May 7, 1945. Since the complaint was filed the $6000-ceiling on the eighty houses has been lifted, and while all have been rented con-

tinuously, none have been sold pending the outcome of the litigation.

Appellant's contention is that the parties to the enterprise of erecting the houses were bound together by fiduciary ties, and that the purchase of the houses by the two directors at a price which diminished and wiped out his agreed share of the profits, was a violation of their fiduciary duties to him, and a fraud *per se*. Both the trial court and the Appellate Court, while treating the relationship of the parties as something more than employer-employee, found that no fiduciary relation existed, that the directors had not overreached in purchasing the real estate from the corporation, and that there had been no fraud. Our analysis of the relationship and dealings of the parties as set forth by the pleadings and proof does not support that conclusion.

The Appellate Court refused to consider appellant's contention that the relationship was that of joint adventurers, on the ground that the point had not been raised in the trial court and would not be considered for the first time on appeal. While appellant's complaint did not place a legal definition or label on the relationship, the substantive matter for which he contends was fully set forth by his pleadings and proof, and existed as a matter of law. In a court of equity, the substance of the transaction, and not the form, is to be regarded in the determination of the rights of the parties. (*Barling* v. *Peters*, 131 Ill. 78.) A joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proved by facts and circumstances showing such an enterprise was in fact entered into. (48 A.L.R. 1058.) It is the nature of the enterprise undertaken that controls, not the form of the agreement. (*In re Taub,* 4 Fed. 2d 993,) If a joint enterprise be proved either by direct evidence of a mutual agreement, or by proof of facts and circumstances from which it is made to appear that such enterprise was entered into, the law fixes the rights

of the parties. (*Goss* v. *Lanin*, 170 Iowa, 57, 152 N.W. 43.) The substance of appellant's complaint was legally sufficient to justify granting him the relief prayed as a joint adventurer. The Appellate Court's dismissal of the point by saying that "the complaint charges fraud and conspiracy and the cause was tried on that theory" completely overlooks the allegations as to the relationship and duties of the parties from which the alleged fraud and conspiracy arose.

The undertaking in the instant case, evidenced by the contract with Ditis, the assignments of the beneficial interests of the first land trust, and the terms of the trust agreement itself, was a single enterprise in which the parties engaged for their joint profit without any actual partnership or corporate designation. The enterprise, therefore, fell within the definition of a joint adventure as an association of two or more persons to carry out a single enterprise for profit. (*Hagerman* v. *Schulte*, 349 Ill. 11.) The fact that three of the joint adventurers grouped their identity as shareholders under the corporate entity of the Ahlvin Construction Company, then in existence, does not operate to exclude appellant from the venture, for by his contract and assignment of beneficial interest it could be said that he was, in effect, a joint adventurer with the corporation. The fact remains, too, that he continued to act as an officer of the corporation even though not a shareholder, and as such was not completely excluded from the corporate affairs. "Where a contract provides for the payment to a party of a share of the profits of an enterprise, in consideration of services rendered by him in connection therewith, the question is whether it is merely as a measure of compensation for such services or whether the agreement extends beyond that and provides for a proprietary interest in the subject matter out of which the profits arise and an ownership in the profits themselves. In the former case, the parties bear to each other, generally speaking, the rela-

tionship of master and servant or principal and agent, while in the latter case they are usually regarded as joint adventurers." (30 Am. Jur. 689, par. 24.) In the present case the land trust agreement itself supplies the answer to the test, when, after excluding the possibility of a proprietary interest in the subject matter from which the profits were to arise, it provides that the holders of the beneficial interest shall have a proprietary interest in the earnings, avails and proceeds thereof. Appellees' contention that appellant could not be a joint adventurer because he had no interest in the land cannot be sustained, for, by the terms of the trust agreement, which in part controlled the joint adventure, title was put in the trustee to the exclusion of all the joint adventurers. It is our opinion that the pleading and proof amply established the relationship of joint adventurers between the parties.

Similar enterprises for the purchase and sale of real estate for profit, which have been reported in the decisions of this court, (*Harmon* v. *Martin,* 395 Ill. 595; *Hagerman* v. *Schulte,* 349 Ill. 11,) have been held to be joint adventures having, in general, the legal incidents of a partnership, and while it is said that a joint adventure is not regarded as identical with a partnership, the relation of the parties is so similar that their rights and liabilities are usually tested by the rules which govern partnerships. We have further held, in considering such land trading ventures, that the parties engaged in such an enterprise, though no general partnership exists, are partners in the particular transaction. (*Parish* v. *Bainum,* 306 Ill. 618.) The last-cited case, quoting from *Meehan* v. *Valentine,* 145 U.S. 611, points out that the requisites of a partnership are that "the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits." We also pointed out in the *Parish case* that an agreement to share losses is not necessary to constitute one a partner,

but that the test is sharing in the profits. Measured by these decisions, the conclusion is strengthened that the substance of the relationship created between the parties by their transactions was that of joint adventurers.

Abundant authority may be cited that the relation between joint adventurers is fiduciary in character; however, the rule is most aptly summarized in 30 Am. Jur. 695, par. 34, as follows: "The relationship between joint adventurers, like that existing between partners, is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise." Words of like purport were previously expressed by this court in *Hagerman* v. *Schulte,* 349 Ill. 11.

While we have no thought to hold that Hubschman and Crosell were guilty of a conscious purpose to defraud, their concerted action seems to have been aimed at removing Ditis entirely from the enterprise and at diminishing the share of profits he would receive under his agreement with them. The relationship of the parties was voluntary and the contract fixing Ditis's interest at 37½ per cent was freely entered into. All of the parties appear to have been persons of business acumen with wide experience in the construction field, the appellees to a greater degree than the appellant, and who knew, or should have known, the obligations and consequences of their association and agreement.

The fiduciary relationship between coadventurers ordinarily precludes one of them from purchasing or leasing property relating to the enterprise, either for himself or another, in the absence of full disclosure to his associates. (*Meinhard* v. *Salmon,* 249 N.Y. 458, 164 N.E. 545.) The record in the present case reveals neither a disclosure to Ditis prior to the sale, nor circumstances which would make such a disclosure unnecessary. Even if the corporation

was indebted to Hubschman and Crosell in the amounts they claimed, and presuming that said amounts could be traced to the housing project, their conduct cannot be justified. There is no showing that they sought or were refused payment by the company or contribution from their co-adventurers. No emergency existed, nor did they stand in a position to lose their money or the property of the enterprise. The venture was possessed of eighty-one completed houses at a time when the full ceiling price of $6000 or $6250 could have been realized with little expense or delay. It does not appear that any effort was made to sell these houses on the open market, but, on the contrary, there is good reason to believe from the record that they were rented rather than sold at their completion, in contemplation that the ceiling on the sale price would be lifted. While Hubschman and Crosell could not have known the date, it was a possibility which, in the absence of a forced sale, should have been shared by all the coadventurers. By their purchase and the manner in which it was accomplished, the two sought and acquired a preference for themselves over the interest of Ditis, their coadventurer. This is true whether the joint adventure be construed as being between the four men as individuals or between Ditis and the corporation, for it was only by asserting their powers as directors that Hubschman and Crosell were enabled to effectuate the undisclosed sale. Further fraud was wrought on Ditis when the private purchase was made at a price below the amount obtainable at public sale. While the sale was effective at law to place title to the subject matter of the enterprise in Hubschman and Crosell, it was not a sale within the contemplation of the agreement of the coadventurers, and therefore ineffective to place a limit on the profits in which Ditis had a right to share. His rights and interests in the proceeds of the property, distinct from the legal ownership, constitute a trust or equity, which a court of equity will protect and enforce whenever its aid for that

purpose is properly invoked. (*Ingraham* v. *Mariner,* 194 Ill. 269.) It was erroneous for the lower courts to hold that the sale did not violate any rights of appellant and that no fiduciary relation existed between the parties.

It is our further opinion that Hubschman and Crosell did not exhibit the good faith requisite to their relationship with Ditis when they secretly created the second land trust. Of the many explanations made for the act, it stands forth most prominently in the record that their action was based upon a desire to have security for personal loans made to the corporation. Such undisclosed act was, again, a self-asserted preference over their coadventurer and a violation of their duty to deal openly and fairly with him. Without attempting to fully compute the finances involved, we note that the salary paid to Hubschman during the construction of the housing project nearly approximated the amount of his loan, while the salary paid to Crosell was considerably in excess of the amount he is said to have loaned. In this respect it should not be forgotten that Ditis received no salary but was to be paid for his services by sharing the profits. In any event, we cannot hold that said loans have been shown to constitute a justification for the breach of the fiduciary duty the two men owed to appellant.

It is our conclusion that the judgment of the Appellate Court should be reversed as to that portion which approved the trial court's decree that appellant was bound by the sale to appellees, Hubschman and Crosell, and should be affirmed as to the portion which approves the balance of the decree. The cause is remanded to the circuit court, with directions to proceed with the decree for accounting in accordance with the views expressed herein, and for such other proceedings as equity may require from time to time.

*Affirmed in part and reversed in part,*
*and remanded, with directions.*

Mr. Justice Gunn, dissenting.