**Roscoe G. Sappenfield, Appellant, v. Leonard C. Mead, Appellee.**

**Gen. No. 10,332.**

Opinion filed July 12, 1949.
Released for publication August 1, 1949.

WILLIAM E. LUCAS and CASSELS, POTTER & BENTLEY, all of Chicago, for appellant; WILLIAM E. LUCAS and CHARLES L. MICHOD, JR., both of Chicago, of counsel.

HOWARD B. BRYANT, of Chicago, and FRANK R. REID, JR., of Aurora, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

The complaint in this case alleged that the defendant, the plaintiff and other named persons filed, on May 8, 1942, in the circuit court of Kane county, their petition for a writ of certiorari to review and reverse a zoning decision of the Board of Supervisors of Kane county and that thereafter, on or about July 15, 1946, this petition was dismissed with prejudice by virtue of a stipulation of the parties filed therein upon the payment to the plaintiffs of $15,000. It was further alleged that this $15,000 was paid to defendant as a trustee for the seven remaining plaintiffs in the zoning proceeding and the plaintiff averred that there was no agreement among the plaintiffs in that cause as to the division of any expenses or costs or of any monies received by reason of the dismissal of said suit.

The complaint then alleged that on or about July 15, 1946, the defendant in the instant proceeding without having consulted the plaintiff as to a division of said sum of $15,000 tendered to the plaintiff the sum of

$500 as his share thereof; that the division of said amount, as stated by defendant, is on an alleged basis of damages but plaintiff avers that said sum was not paid as damages but solely for the dismissal of the zoning suit. The complaint prayed for an accounting and a money decree against the defendant for whatever sum is found to be due the plaintiff.

The defendant answered the complaint admitting the institution and dismissal of the zoning proceeding and the receipt by him of the $15,000 as alleged but he denied it was paid to him as trustee but averred that the dismissal of the zoning suit and the division of the $15,000 which he made was in accordance with a stipulation signed by all the parties interested in the zoning suit and that the money he received was paid to him to pay the expenses, costs and attorney fees of said zoning suit and other related litigation and to pay the damages suffered by all parties in interest in said litigation. The defendant admitted he tendered the plaintiff a check for $500 which he alleged plaintiff still has in his possession and avers that by accepting said check and retaining the same, plaintiff is barred and estopped from bringing this suit. The answer denied that the defendant had been guilty of any breach of trust or that he had made an improper distribution of the $15,000 or that he had made distribution thereof in an arbitrary manner or on an improper basis, but alleged that he had made a complete and correct accounting and distribution on the basis of costs, expenses and attorney fees growing out of the zoning suit litigation and the damages suffered by the various property owners as a result of the construction of the factory and plant which the zoning suit sought to prevent; that all parties interested in said suit have accepted the sum paid to them in full satisfaction of their interest in said fund and avers that the acceptance of defendant's check for $500 by

the plaintiff constitutes an accord and satisfaction of any claim the plaintiff may have against the defendant.

The reply of the plaintiff denied that he and the other plaintiffs in the zoning suit consented to its dismissal on condition that $15,000 be paid to defendant for expense of said suit and other related litigation and the damage suffered by the parties thereto, denied that the plaintiff accepted his proper share of said $15,000 and denied that the other parties interested had accepted payment from the defendant so as to make an accord and satisfaction of any claim they might have against the defendant and denied that there was ever any agreement among the plaintiffs as to the division of the $15,000. Upon the issues thus made the cause was heard by the chancellor, resulting in a decree dismissing the complaint for want of equity and the plaintiff appeals.

The record discloses that on April 10, 1942, the Board of Supervisors of Kane county reclassified an area located just outside the City of Geneva which adversely affected many property owners including the parties to the instant proceeding. A considerable number of those so adversely affected organized themselves into a group and determined to contest the decision of the board and in order to do so the parties to this suit and others filed in the circuit court of Kane county a petition for a writ of certiorari to review and reverse the zoning decision of the board. After the property had been rezoned and while this petition was pending a manufacturing plant known as the Burgess-Norton plant was built in the rezoned area. In 1946, this plant was sold to the Dunbar-Kapple Company and the defendant and C. A. Shults, the attorneys of record representing the plaintiffs in the original certiorari proceedings negotiated with the company and received from it $15,000 in consideration of the dismissal of the certiorari suit. The authority under

which the defendant and Mr. Shults proceeded is as follows:

"January 14, 1946

"To Messrs. Leonard C. Mead and
  Carleton A. Shults
  Attorneys at Law

Gentlemen:

You are attorneys of record for the undersigned in that certain proceedings pending in the circuit court of Kane County, Illinois, entitled: Bruce Hinman et al., plaintiffs, vs. County of Kane et al., defendants.

As our attorneys aforesaid, you are hereby authorized and empowered, in connection with a proposal for the settlement and disposition of the aforesaid matter, to enter into negotiations for the settlement thereof under such terms as in your sole judgment may be deemed proper to consumate such negotiations and to enter into and execute for and in behalf of the undersigned, a stipulation to quash the writ of certiorari heretofore issued in said cause, to dismiss said proceedings of record and to execute any and all other documents and do and perform any and all other required acts necessary or deemed advisable by you in the premises in order to effect full and complete settlement thereof and all of which are hereby ratified, approved and confirmed by us."

This letter was signed by all the plaintiffs in the certiorari proceeding including the plaintiff and defendant in this proceeding.

The record further shows that the certiorari proceeding was dismissed with prejudice on July 15, 1946 and the defendant received from the Dunbar-Kapple Company $15,000. On July 19, 1946, the defendant wrote the plaintiff as follows:

"Dear Mr. Sappenfield:

I am enclosing check for $500.00 drawn upon my trust account to your order, the check being in pay-

ment of damages to your property by reason of the construction of the factory near your home.

I am also enclosing copy of an opinion by an expert tax accountant that this money is not income and that you will not have to pay a tax upon the same. If you have any trouble with the revenue department, I would suggest that you consult my office and I will have my revenue man take the matter up with the government, as this money should be exempt from income tax.''

A similar letter was written by defendant to the several other parties interested and a check for the amount which he determined each party was entitled to receive was enclosed in the letter. Each retained the check so sent. Mr. Sappenfield retained his check and thereafter consulted attorneys and at their request defendant wrote the plaintiff on September 4, 1946, as follows:

''Dear Mr. Sappenfield:

I have received a request from Cessna, Lucas and Hammand, Attorneys in Chicago, to provide them with the figures and division of the $15,000 received from Dunbar-Kapple Company as damages in the zoning suit.

These figures are as follows:

| | |
|---|---|
| Carleton Shults, balance attorney's fees for appearing before the local zoning committee and the Board of Supervisors in the Circuit Court at Geneva, Illinois, | $1250.00 |
| Escrow fee paid to First National Bank of Chicago, being 1/2 of the fee | 25.00 |
| Harry F. Shea for opinion on income tax | 30.00 |
| George Osborne, for real estate services | 250.00 |
| Ruth Snyder, for services before Illinois Com. Comm. | 50.00 |
| Filing charges and attorneys fees paid in annexation suit | 300.00 |

| | |
|---|---:|
| Subscriptions estimated at | $ 400.00 |
| Bruce Hinman | 1500.00 |
| Theodore Johnson | 500.00 |
| Mrs. Charles W. Rockwood | 1250.00 |
| Harry White | 1500.00 |
| L. C. Mead | 1500.00 |
| R. G. Sappenfield | 500.00 |
| Geneva Golf Club | 6000.00 |

"Mr. Paul Swazea was treasurer of the fund but to date has been unable to locate the list of contributors, and the amounts, and he did not know the exact amount contributed, but it was somewhere between $400.00 and $600.00. This money should be returned to the original contributors. There are one or two other small items that we may receive bills for, and then I will be able to make a complete report on this matter."

The evidence further discloses that the plaintiffs in the certiorari proceeding held several meetings for the purpose of determining the course of action which should be taken to prevent the value of their respective properties from being adversely affected by the proposed reclassification. Both the plaintiff and defendant testified that at these various meetings the question of the distribution of whatever amount might be realized from dismissing the certiorari proceeding was discussed. The plaintiff testified that he attended four or five of these meetings at defendant's home and one at his office and that all but one or two of the plaintiffs were present at these meetings. As abstracted, this witness continued: "At none of the meetings was there a discussion as to the amount to be paid to each of the plaintiffs in the rezoning case out of the settlement fund, that is, as to specific amounts. The division of the settlement fund was discussed. Some one raised the question (at one meeting) as to how the money would be distributed and I think it was Mr. Mead who answered and said, 'Well, we will cross that bridge

when we get to it'. and I suggested that Mr. Osborne, who was present and who had been present at these meetings, make an estimate of the damage of the properties and bring that in and we would discuss it. I suggested Mr. Osborne because of his experience with real estate and because of the fact that he was not a party to the suit and was independent in that respect. I don't believe there was any dissent or acceptance of that.'' Upon cross-examination he testified: ''At these meetings the question under discussion all the time was the settlement of this suit pending here in the circuit court. These meetings would take an hour or two in length. The question of the distribution was discussed on the basis of the damage to the respective properties. I presumed it would be on that basis. That is why I suggested Osborne making a determination and bringing it in and that is the basis on which everyone discussed the question generally.''

The defendant testified as to what discussions were had at these meetings held at his home and office and attended by the plaintiff and other parties interested in the litigation. He testified that all the meetings were held at his home except the last one which was held at his office a day or two prior to January 14, 1946. At this meeting besides the parties to this suit there were present Mr. Hinman, Mr. White, Mr. Hollscher, the president of the Geneva Golf Club and Mr. Shults. As abstracted, the defendant testified: ''There was a conversation at that time about the settlement of the lawsuit and about the manner in which any money received therefrom was to be divided. I had an offer of settlement of $15,000.00 at that time. The purpose of that meeting was to have Mr. Shults present and the various members of the committee so as to discuss what might happen in this lawsuit. Shults advised them that we might take it to the Supreme Court and that we might lose it or that the Supreme Court might send it back for the question of damages and that they

would never get an order of court compelling them to remove the factory because it was a government project. Mr. White made the suggestion that I draw the agreement and prepare it for the members to sign, make the appraisal of damages and disburse the money. There were similar conversations about the division of this money on the basis of damages at the other meetings. Someone said they would accept an appraisal by me. Mr. Hoelscher said he would and also Mr. White. Mr. Sappenfield never said anything at any of those meetings nor did he ever tell me at any time that he would accept a specific amount of this $15,000.00. No one suggested that they would accept a specific amount. It was left to me to determine what the damage was to each property owner.''

George Osborne, a civil engineer who had specialized in the management and evaluation of real estate since 1919, referred to in the testimony of both Mr. Mead and Mr. Sappenfield, testified that he was not one of the plaintiffs in the zoning case but attended the meetings referred to in their testimony and was present at the meeting when Mr. Sappenfield suggested that he, Osborne, estimate the damages and make the distribution of the fund. He further testified that there was no agreement to this suggestion of Mr. Sappenfield nor was there any objection to it; that as a result of the several meetings which he attended he, Osborne, made an estimate which included elements which are not ordinarily taken into account and classified as damages and had had several conversations with Mead in connection therewith. He was not asked and gave no opinion as to the damage to the property of Sappenfield or to the property of the other parties interested, by the erection of the factory. It might be noted, however, that in acknowledging receipt of Mr. Mead's check for $250 for the services he had rendered Mr. Osborne wrote Mead: ''Please accept my congratulations on your capable handling of this matter.''

The only other witness who testified on this hearing besides Sappenfield, Mead and Osborne was Frank H. Dalton, a realtor and builder living in Aurora. He testified that he was familiar with the value of property in the vicinity of Aurora and the Burgess-Norton factory; that he was familiar with the properties of the several parties interested in the zoning proceeding and in answer to a question assuming that the several properties were damaged by the erection of the factory and that there was $12,700 to be divided among the property owners in accordance with the damage suffered, this witness gave it as his opinion that $500 would be a fair share in dollars to which Mr. Sappenfield would be entitled and gave the facts upon which he based his opinion.

It is insisted by the plaintiff that the property owners who filed the zoning petition were engaged in a joint adventure and that the evidence discloses that there was no agreement among them as to any division of the monies received as a result of the zoning suit, or any agreement as to how the expenses of the same were to be borne and therefore the law requires an equal division among them as joint adventurers, and upon this basis, he contends that he is entitled to one-seventh of the $15,000 less certain expenses, which he admits to be proper. The position of the defendant is that the plaintiffs in the zoning case were merely representatives of a group of property owners adversely affected by the zoning decision of the Board of Supervisors and that they joined together, not for profit, and not in a joint adventure, but merely because they had a common problem, that of protecting their own individual properties from the effect of the decision of the Board of Supervisors to reclassify the area in question. Defendant further insists that the evidence discloses that he had full authority to not only make the settlement of the zoning suit but to disburse the proceeds in the manner in which he did.

Both the plaintiff and the defendant testified that at the various meetings of the parties to the zoning suit the question of the distribution of any money that might be realized from dismissing said suit was discussed on the basis of the damages to the properties of the parties interested. There is no equitable way to divide this $15,000 other than upon the basis of the damages to the various properties affected. We think the record amply supports the conclusion that damage to the several properties affected was to be the basis for distribution of the $15,000, the amount which came into the hands of the defendant upon the dismissal of the zoning suit. The written authority given defendant by the plaintiff and all the other parties interested in the zoning proceeding is not broad enough, in itself, to cover the distribution of the $15,000 in the manner defendant did distribute it but all the evidence is to the effect that from 1942, when the zoning ordinance was first passed, until July 1946, when the ensuing litigation was closed, defendant, as a property owner affected, and, as attorney for the other property owners, gave the matter his close and constant attention. The record convinces us that all the plaintiffs in the zoning case, including appellant, looked to appellee to handle the various aspects of the controversy, relied upon his judgment and experience and expected distribution to be made on the basis of the damages sustained by the properties of the several parties interested. All of the parties interested have accepted his conclusion as to the amount of their damage and retained the distribution that he sent them. Appellant himself retained the check of the defendant and still has it and at his request he was furnished with an itemized statement of the disbursements and no complaint is made of any item therein.

The only evidence in the record as to the amount plaintiff was entitled to receive on the basis of damage sustained is that of the defendant and Frank Dalton.

The defendant testified that he leaned over backwards so far as appellee was concerned and that if it had come down solely to the question of damages, he, the plaintiff, would have been entitled to about $50. The testimony of Mr. Dalton was that under the facts appearing in this record the proportion of the $15,000 paid to plaintiff by the defendant was fair and just.

It is insisted, however, by counsel for appellant that this was a joint adventure and that appellant was entitled to recover his full one-seventh of the amount received less the several items of expense. In *Hagerman v. Schulte,* 349 Ill. 11, at page 21, a joint adventure is defined as an association of two or more persons to carry out a single business enterprise for profit. In 30 Am. Jur. Title Joint Adventure, sec. 3, p. 672, it is said: "A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly, and, more particularly, as an association of two or more persons to carry out a single business enterprise for profit." Under these authorities the expectation of making a profit is an indispensable element of a joint adventure. (See Vol. 23, Words and Phrases, p. 45 *et seq.;* 48 C.J.S. 809, sec. 2 *et seq.*) There is no evidence in this record which shows that the plaintiffs in the zoning suit filed that suit or took any other steps in connection with it for the purpose of making a profit, or that the profit motive was, in any manner, present in resisting the rezoning of the plaintiffs' properties from "farming" to "industry" by the Board of Supervisors. The record does show that a considerable number of property owners adversely affected, held several meetings for the purpose of determining upon a course of action to be taken by them to meet a common problem, that of preventing the value of their respective properties from being depreciated by the proposed reclassification. The record shows no other motive and, in our opinion, does not establish a joint adventure.

We are not unmindful that a trustee is held to a high standard of conduct. There is no evidence in this record of wrongdoing or overreaching on the part of the defendant, nor do we find any advantage that he obtained by virtue of his relationship to the other parties with whom he was associated.

The decree is supported by the evidence found in the record and is therefore affirmed.

*Decree affirmed.*