Carlyn **DONAHOO** (Plaintiff), Respondent,

v.

**ILLINOIS TERMINAL RAILROAD COM-PANY**, á Corporation (Defendant), Appellant.

No. 43743.

Supreme Court of Missouri.

Division No. 2.

Jan. 10, 1955.

Motions for Rehearing or to Transfer to Court en Banc Denied Feb. 14, 1955.

Ely & Ely, Robert C. Ely, Alphonso H. Voorhees, St. Louis, for (defendant) appellant.

Miller & Landau, St. Louis, for respondent.

BENNICK, Special Judge.

This is an action for damages for personal injuries sustained by plaintiff, Carlyn Donahoo, when a motor vehicle in which he was riding was struck by a freight train owned and operated by defendant, Illinois Terminal Railroad Company.

The accident happened on November 13, 1951, in Madison County, Illinois, at a point where a highway known as Cotter's Hill Road crosses defendant's track some little distance east of the City of Wood River.

Upon a trial to a jury in the Circuit Court of the City of St. Louis, a verdict was returned in favor of plaintiff, and against defendant, for the sum of $55,000. Judgment was rendered upon the verdict; and following an unavailing motion for judgment in accordance with its motion for a directed verdict or, in the alternative, for a new trial, defendant gave notice of appeal, and by proper successive steps has caused the case to be transferred to this court for our review.

Plaintiff resides in Staunton, Illinois, but for ten years preceding his injury had been employed by the Shell Oil Company at its refinery in Wood River.

It appears from a map of Illinois that Staunton is northeast of Wood River and

about twenty miles distant on a direct line. Undoubtedly the distance by highway is somewhat greater.

The evidence disclosed that in order to provide economical transportation to and from their work and save wear and tear on their own individual automobiles, some thirty of the Shell Company's employees residing in Staunton, including plaintiff as one of their number, had organized a non-profit corporation known as Staunton Shift Workers, whose principal asset seems to have been a Chevrolet carryall, which is a passenger vehicle built along the general lines of the ordinary station wagon. The carryall was apparently constructed so as to accommodate the driver and six passengers (or seven persons in all), with the driver and one passenger occupying the front seat; two passengers in a short middle seat; and three on the full rear seat. There were two doors to the carryall, one to either side of the front seat which was divided so that the portion reserved for the passenger would tip forward; and except for the driver who entered to his stationary seat from the door to his left, all persons entering the carryall would use the door to the right and pass through a narrow aisle to their seats farther back. While it was possible for the rear end of the carryall to be opened up, such opening was merely a service door and was not designed for the use of the occupants of the vehicle.

Title to the carryall was in the corporation for which a charter had been obtained from the State of Illinois. It was employed exclusively as a means of transportation to and from work for the thirty men who had organized the corporation, and was in use for the full twenty-four hours of each working day. One group of men going on shift would ride in it from their homes to the plant; a corresponding group coming off shift would then ride in from the plant to their homes; and so on for the three shifts each day that the plant was in operation. For meeting the expenses incurred a monthly assessment, varying somewhat from month to month, would be made against the thirty members of the group. There was no designated place where any one of the men would sit when riding in the vehicle; and any one who expressed a desire to drive would be permitted to do so, with the choice of route apparently left to him. Plaintiff had sat in each of the various seats at different times, and had also served as driver on several occasions.

On the day in question plaintiff came off shift at 4:00 o'clock in the afternoon and immediately started for his home in the carryall along with the six of his companions who had accompanied him to work in the morning.

One Spagnola was driving, and plaintiff was sitting in the second seat directly behind him. The other men occupied the remaining five positions in the car, one in the front seat to Spagnola's right; one in the short second seat to plaintiff's right; and three in the rear seat which extended the full width of the body of the vehicle.

Of the several routes available for returning to Staunton, the one selected on this occasion was to leave Wood River by what is known as the old Edwardsville Highway, which runs generally east and west as does also Illinois Highway No. 159; turn north on Cotter's Hill Road, an oiled secondary highway which ends at 159 and carries the least traffic in the late afternoon; and then turn east on 159 to Edwardsville, and from there on north to Staunton. The old Edwardsville Highway runs almost parallel with and about one-fifth of a mile south of 159; and in between the two is defendant's single railroad track, which also runs east and west about 100 feet south of 159. It thus is seen that after leaving the old Edwardsville Highway and turning north on Cotter's Hill Road, it was necessary to cross defendant's track before reaching 159.

One approaching the crossing from the south comes down what appears from the photographs to be a fairly sharp incline which levels off only a short distance before the track is reached. Although the road was in general use by motor vehicles of all sorts, the crossing itself was shown

to have been quite rough and uneven at the time involved in this proceeding. Not only did the rails extend appreciably above the surface of the roadway, but on both sides of each rail, and particularly on the outer sides, troughs or depressions had been dug out in the surface of the highway for practically its entire width by the wheels of vehicles passing over the crossing. According to the testimony of certain of the witnesses, such troughs or depressions on the outer sides of both rails were from ten to twelve inches in depth at their deepest points, and from two to three feet in width from edge to edge.

The accident happened around 4:15 or 4:20 o'clock, only a relatively few minutes after the group had left the plant for their homes. It was still daylight and bright; visibility was good so far as atmospheric conditions were concerned; and the roads were dry.

The carryall approached the crossing at a speed of ten to fifteen miles an hour, and when the front of the bumper was about ten feet from the track, Spagnola brought the vehicle to a complete stop and both he and plaintiff looked in both directions to see if a train might be oncoming. What the other occupants of the carryall may have done for their own safety is of unimportance in connection with the issues raised on this appeal. Before coming as near as ten feet of the track, a look to the east was unavailing because of an embankment along the south side of the track which was covered with a dense growth of high weeds, brush, and trees.

At the point ten feet from the crossing it was possible to see down the track to the east for 250 feet, but neither plaintiff nor Spagnola saw a train for the reason that at that moment, if plaintiff's evidence was to be believed, the train which later figured in the accident was not yet close enough to the crossing to be within the range of vision. Spagnola then moved up to a point five feet from the track and stopped for a second look, but again there was no train within the increased distance of 275 feet that he and plaintiff could see

down the track from the nearer vantage point. It appears that east of the crossing there is a gradual curve in the track towards the south, which of course lessens the distance within which either a vehicle on the crossing, or a train approaching from the east, is discoverable to the occupants of the other.

After the second stop Spagnola started over the crossing and had progressed to the point where the front of the carryall was barely across the track when the carryall stalled, causing the motor to die, as the front wheels reached the trough or depression which had been worn down into the surface of the highway immediately to the outside of the north rail. Because of the roughness of the crossing Spagnola had kept the carryall at a very low speed as he bounced across the rails; and the killing of the motor occurred in the attempt to climb out of the trough or depression into which the front wheels had dropped. As plaintiff himself described it, "In trying to climb up the small grade on the north side of the rail, it stalled, going very slow, and just as it got to the top of getting out of the gully it stalled and fell back into the gully."

In this predicament the carryall was of course stopped completely crosswise of the track, with plaintiff sitting in a position which placed him directly over the south rail.

The moment the carryall stalled both plaintiff and Spagnola glanced again to the east but saw no train, although from the point of the crossing itself they could see down the track for a distance which plaintiff's evidence estimated to be 1,000 feet before the track curved out of view behind the embankment. In fact defendant's evidence put the range of visibility to the east from a point on the crossing at an even greater distance of from 1,200 to 1,500 feet.

Spagnola started up his motor and made another attempt to pull on across the track, but again the motor died, causing the carryall to slip backward, as it had done before, until its front wheels came to rest

in the depression. For a second time Spagnola engaged the starter, and just as the motor started up, his companion on the front seat, one Zak, glanced to his right and called out, "Oh, my God, here comes a train!" At Zak's cry plaintiff looked to his right and saw the approaching train only 300 feet away. The carryall, after being put in motion, had moved forward for perhaps as much as seven and one-half feet, with its rear wheels about a foot beyond the south rail, when it was struck by the train and pushed down the track for 1,221 feet by actual measurement to where the front of the engine came to a stop. It had attained a speed of about five miles an hour, and was picking up speed at the moment it was struck. Spagnola, Zak, and two others were killed, while plaintiff and the remaining two men escaped with their lives, but with plaintiff suffering the serious injuries for which he seeks to be compensated in this proceeding.

The train was composed of thirteen loaded coal cars and a caboose, and was being pulled by a Diesel locomotive.

According to plaintiff's evidence, the train, when it was first discovered, was running at a speed of thirty-five or forty miles an hour, which was not appreciably diminished before the collision. Plaintiff himself heard no bell or whistle until the very moment the collision occurred, although two of the windows of the carryall were open, and he was on watch for the approach of a train. He was corroborated by another of the survivors, one Bloemker, who had heard no whistle until a matter of seconds after Zak had given warning that a train was in sight.

While there was no controversy about the broad pattern of the accident, there was considerable disagreement in the testimony over many of the specific details of the occurrence.

According to defendant's version of the facts, the train was running at a speed of only twenty-five or thirty miles an hour as it approached the scene of the accident. The engineer was at his normal position in the right side of the cab; the fireman and the head brakeman were in the left side of the cab; and the conductor was in the caboose at the rear of the train.

Although the engineer was looking straight ahead, the train was on a curve to the left as it approached the crossing, and he testified that the first he knew of the presence of the carryall on the crossing was when the fireman called out to him to throw the train into emergency and he leaned out of the cab and saw the carryall on the track. The fireman, according to his recital of the facts, had watched the carryall move up to the crossing and come to a dead stop upon it; and when he called out to the engineer to throw on the emergency, the train was variously estimated as being from seventy-five to 200 feet away from the crossing. The engineer testified further that he had already begun his whistle for the crossing, and that when he received the signal from the fireman, he applied his emergency brake and continued to keep the whistle blowing. He estimated that the speed of the train was reduced as much as four or five miles an hour by the time it reached the crossing where the collision occurred with the disastrous results already indicated.

The engineer insisted that at the speed at which the train was running and under the conditions that existed, it would have been impossible for him to have stopped the train in any shorter distance than he did. The conductor testified that except for water on the rails which dripped down from the coal, the train could have been stopped within a distance of 500 feet. As to how much the speed of the train could have been reduced within the space available after the engineer received the warning from the fireman, the conductor stated, "Well, he couldn't do very much."

The case was submitted to the jury upon two theories of defendant's liability.

The one, which was incorporated in plaintiff's instruction No. 1, was that defendant's servants in charge of the train saw the carryall in a position of imminent peril and danger of being struck in time

thereafter, by the exercise of ordinary care, with the means and appliances at hand, and with reasonable safety to themselves, to have slackened the speed of the train and thereby have avoided the collision, but negligently failed to do so.

The other, which was submitted by plaintiff's instruction No. 1–A, was that defendant's servants in charge of the train had failed to sound a signal warning by bell or whistle at least eighty rods from the crossing, and to keep the same sounding until the crossing was reached, as required by a statute of the State of Illinois, Ill. Rev.St.1953, Chap. 114, Sec. 59.

Incidentally, plaintiff stated in his petition that he was relying for the establishment of his claim upon the substantive law of Illinois, thereby requiring the local courts to take judicial notice of the public statutes and judicial decisions of such state. Section 509.220, RSMo 1949, V.A.M.S.; 42 V.A.M.S., Supreme Court Rule 3.14.

The defense was put upon a general denial coupled, first, with a charge of contributory negligence on plaintiff's own part in that he had failed to discover the approach of the train, as he might allegedly have done, in time to have left the carryall and placed himself in a position of safety before the collision; and second, with a charge that Spagnola, the driver of the carryall, had been guilty of negligence which was allegedly imputable to plaintiff upon the theory that the two were engaged in a joint enterprise in connection with the use and operation of the carryall at the time.

For its first point defendant argues that the court erred in overruling its motion for a directed verdict at the close of the entire case as well as its subsequent motion for judgment in accordance with such prior motion.

Defendant does not press this point from the standpoint of any want of evidence to have made a submissible case for the jury upon at least some proper theory of its own liability. On the contrary, its whole complaint on this feature of the case is

that plaintiff should have had a verdict directed against him upon the ground of contributory negligence as a matter of law, embracing not only his own personal negligence, if any, but also Spagnola's negligence, if any, which, as we have already pointed out, defendant would have imputed to plaintiff upon the theory of joint enterprise between the two.

Under the law of Illinois the plaintiff's contributory negligence is of course a complete defense to his right of recovery except for those instances where he has founded his claim or cause of action upon a charge that his injury was the direct and proximate result of willful and wanton conduct on the part of the defendant. Whenever such a situation obtains, the doctrine of contributory negligence has no application to the case. Little v. Blue Goose Motor Coach Co., 346 Ill. 266, 178 N.E. 496; Illinois Cent. R. Co. v. Oswald, 338 Ill. 270, 170 N.E. 247; Bryan v. Sweeney, 363 Mo. 1024, 256 S.W.2d 769; Connole v. East St. Louis & Suburban Ry. Co., 340 Mo. 690, 102 S.W.2d 581.

In this case, after instructing the jury upon the two grounds of defendant's negligence as already indicated, the court gave plaintiff's instruction No. 2–A, which told the jury that if they found that defendant's acts or omissions as submitted in instruction No. 1 (failure to slacken speed after actually seeing the carryall in imminent peril and danger of being struck) had manifested a willful or reckless indifference to plaintiff's rights, safety, or physical welfare, then plaintiff's contributory negligence, if any, was no defense to the case.

In so far as such instruction told the jury that plaintiff's contributory negligence, if any, would be no defense against a finding of willfulness and wantonness, it was of course correct. Defendant contends, however, that the instruction was prejudicially erroneous upon two grounds, the first of which is that there was no evidence of willfulness and wantonness on defendant's part in connection with the acts or omissions submitted as a predicate of liability in plaintiff's instruction No. 1

to which instruction No. 2–A was specifically directed. If it be true that there was no evidence upon which to base instruction No. 2–A, then it was obviously error to give it; and if plaintiff's contributory negligence could be said to have appeared in the case as a matter of law, defendant's motion for a directed verdict should in that event have been sustained.

For conduct to be subject to. the characterization of willful and wanton under the law of Illinois, it must either have been intentional, or else the act or omission must have occurred under circumstances exhibiting a reckless disregard for the safety of others and a conscious indifference to consequences, such as the failure, after knowledge of impending danger, to exercise due care to prevent it, or the failure to discover the danger through wantonness or recklessness when it could have been discovered by the exercise of due care. Carrow v. Terminal R. Ass'n of St. Louis, Mo.App., 267 S.W.2d 373, 378, and Illinois cases cited.

It is to be kept in mind that in submitting the question of willfulness and wantonness in connection with the issue of failure to slacken the speed of the train as previously hypothesized in instruction No. 1, plaintiff was relying exclusively upon a failure to slacken speed after defendant's servants "saw" the carryall in a position of imminent peril and danger, and not upon any omission to act after they "could have seen" the carryall in such position. In other words, the question submitted by plaintiff's instructions Nos. 1 and 2–A was purely one of liability after discovered peril, and not of liability after discoverable peril where, as in this instance, a duty existed to be on watch. Plaintiff of course had the undoubted right to impose such limitation upon the field of defendant's liability, but in so doing he must stand or fall, not upon some abandoned theory, but instead upon his chosen theory in determining the sufficiency of the evidence to support the instruction which is now the subject of defendant's

attack. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91.

The anomaly of the situation. is that while plaintiff specifically predicated his right of recovery upon the hypothesis that defendant's servants saw the carryall in a position of imminent peril and danger in time thereafter to have slackened the speed of the train and thereby have avoided the collision, he now undertakes to support the submission of such question by reliance solely upon the evidence, not that defendant's servants actually saw the carryall, but that they could have seen it stalled on the crossing when the engine approached a point 1,000 feet to the east. From this he argues that the jury would have been warranted in finding that within such distance of 1,000 feet, and at the speed at which the train was running, its speed could have been reduced sufficiently to have allowed the carryall to clear the track, inasmuch as the carryall had attained a speed of five miles an hour by the time of the collision and had progressed to the point where its front wheels were out of the depression and its rear wheels somewhat beyond the south rail.

It is true that the fireman testified that he watched the carryall come down the hill and proceed upon the crossing, but plaintiff may not avail himself of such testimony for the reason that it was totally inconsistent with his own theory of the case. Steuernagel v. St. Louis Public Service Co., 357 Mo. 904, 211 S.W.2d 696. On the contrary, his own theory was that the carryall was already stalled upon the crossing while the train was still out of sight more than 1,000 feet away. There was no evidence from plaintiff's side of the case as to when defendant's servants actually saw the carryall, and the only evidence from defendant's side in any way consistent with plaintiff's theory of the case was that the fireman first saw it on the crossing when the train was only 200 feet away. However there was no proof that any slackening of speed would have been availing within this short distance; and it was therefore manifest error to

give instruction No. 2–A submitting the question of whether the acts or omissions hypothesized in instruction No. 1 had been willful and wanton when as a matter of actual fact they were insufficient to warrant a finding of even actionable negligence for nonobservance of discovered peril.

■ With willfulness and wantonness out of the case for all the purposes of this appeal, contributory negligence becomes a complete defense to any liability for mere negligence on defendant's part; and this brings us once again to the question initially posed by defendant as to whether contributory negligence appeared as a matter of law so as to have entitled defendant to a directed verdict.

In the consideration of this question, certain facts at once stand out as being of particular consequence. It is important that plaintiff was not the driver of the carryall, but was seated behind the driver in a position which gave him but little opportunity other than to stay where he was and trust that Spagnola would be successful in getting the carryall across the track. Nevertheless he was by no means unmindful of his obligation to be on the alert for his own safety, and he did look towards the east on repeated occasions while also maintaining a natural and proper interest in the progress which Spagnola was making towards getting the carryall in motion and out of the depression into which its front wheels had lodged. As a matter of fact, he was doing precisely what the other six occupants of the carryall were doing, which, as he suggests in his brief, should have at least some significance upon the question of what was to be expected of a normal person under the circumstances that existed. No doubt some people might believe, just as defendant argues, that he should have discovered the approach of the train sooner than he did and was therefore guilty of negligence directly contributing to his injury in failing to have gotten out of the carryall before the collision occurred. But at most this was a question for the jury to determine, and was not to be resolved as a matter of law.

Since defendant's motion for a directed verdict was not to be sustained upon the ground of plaintiff's own personal negligence, the only remaining question is whether it should have been sustained upon the ground of Spagnola's negligence, depending, of course, upon whether Spagnola's negligence, if any, appeared as a matter of law, and whether it was in any event to be imputed to plaintiff upon the theory that he and Spagnola were engaged in a joint enterprise at the time the accident occurred.

■ It is the law in Illinois that in a situation such as this, where two or more persons are engaged in a joint enterprise in connection with the use of a motor vehicle, the contributory negligence of any one will bar recovery by either of them, where the injury arose out of a matter within the scope of the joint undertaking. Grubb v. Illinois Terminal Co., 366 Ill. 330, 8 N.E.2d 934; Johnson v. Turner, 319 Ill.App. 265, 49 N.E.2d 297. Our own local law is to the same effect. Tannehill v. Kansas City, C. & S. Ry. Co., 279 Mo. 158, 213 S.W. 818; Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 59 S.W. 2d 633.

■ In defining what constitutes a joint enterprise, the Illinois courts subscribe to the general rule that it is an undertaking entered upon by two or more persons jointly as an association to carry out a single specific business enterprise for mutual benefit or profit. In other words, for there to be a joint enterprise, there must be a community of interest on the part of all the participants in the fundamental purpose of the undertaking. In its ultimate legal effect it is a partnership limited and confined to the performance of one particular enterprise or venture and controlled by the terms of the agreement under which it is formed or created; and the rights and liabilities of the parties to it with respect to matters and occurrences within its scope are therefore to be tested by the rules governing partnerships in the full sense of the word. Harmon v. Martin, 395 Ill. 595, 71 N.E.2d

74; Ditis v. Ahlvin Const. Co., 408 Ill. 416, 97 N.E.2d 244; Hagerman v. Schulte, 349 Ill. 11, 181 N.E. 677; Spencer v. Wilsey, 330 Ill.App. 439, 71 N.E.2d 804; Sappenfield v. Mead, 338 Ill.App. 236, 87 N.E.2d 220; Schmalzl v. Derby Foods, Inc., 341 Ill.App. 390, 94 N.E.2d 86.

Under the facts of this case which we have stated to the full extent of the record, the conclusion seems inescapable that plaintiff and Spagnola, together with all their associates, were engaged in a joint enterprise in connection with the operation of the carryall as a means of transportation between their homes and their place of work. Certainly they had a community of interest in the single venture upon which they were engaged, and they apparently shared a common right of control. The undertaking was for their mutual benefit and profit; and its fundamental character was in nowise altered or affected by the fact of their organization of a corporation whose only function, so far as the record discloses, was to hold title to the carryall in which they were riding on their way home from work when the accident occurred. Mavrakos v. Mavrakos Candy Co., 359 Mo. 649, 662, 223 S.W.2d 383, 390; Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562.

But even though the parties were engaged in a joint enterprise so that plaintiff was chargeable with any negligence of Spagnola in connection with the operation of the carryall, it does not follow that the motion for a directed verdict was to be sustained upon such ground.

The negligence pleaded and submitted on the part of Spagnola was that he drove the carryall upon the crossing at a time when the train was so close to the crossing that it could not be stopped or slowed down before the collision. The fireman's testimony may have supported the instruction, but plaintiff's evidence was all to the contrary, so that Spagnola's negligence, if any, could in no event be said to have appeared as a matter of law.

While the motion for a directed verdict was properly overruled, the error pointed out in connection with the giving of plaintiff's instruction No. 2–A requires the trial of the case anew. Other matters assigned as error and not adverted to herein may not appear upon a retrial of the case.

The judgment rendered by the circuit court should be reversed and the cause remanded, and it is so ordered.

PER CURIAM.

The foregoing unsigned opinion prepared by the late BENNICK, Judge of the St. Louis Court of Appeals, who sat in this cause under transfer order, is hereby adopted as the opinion of the court.

BROADDUS, Special Judge, LEEDY, J., and ELLISON, P. J., concur.